HOWLAND v. CORN et al.

EMPIRE TRUST CO. v. IMPROVED PROPERTY HOLDING CO. OF NEW YORK et al.

(Circuit Court of Appeals, Second Circuit. February 15, 1916.)

Nos. 71, 72.

1. CONSPIRACY &⇒22—JUDGMENT—PLEADING—SURPLUSAGE—ALLEGATIONS AS TO CONSPIRACY.

An averment that acts were done in pursuance of a conspiracy does not change the nature of a civil action, or add anything to its legal force and effect; and if the conspiracy is not made out, the allegation may be disregarded as surplusage, and damages recovered against such of the defendants as are shown to be guilty of the tort without such agreement.

[Ed. Note.—For other cases, see Conspiracy, Cent. Dig. § 24; Dec. Dig. &⇒22.]

2. CONSPIRACY &⇒24—CRIMINAL PROSECUTIONS—ELEMENTS OF OFFENSE.

In a criminal prosecution for conspiracy, the unlawful combination and confederacy, rather than the overt acts done in pursuance of it, constitute the essential element of the offense.

[Ed. Note.—For other cases, see Conspiracy, Cent. Dig. §§ 33, 34; Dec. Dig. &⇒24.

For other definitions, see Words and Phrases, First and Second Series, Conspiracy.]

3. APPEAL AND ERROR &⇒1029—HARMLESS ERROR—THEORY OF CASE.

In an action by the receiver of a corporation against its directors for an accounting and damages, on the theory that they conspired to sell property to the corporation, which they owned and in which they had an interest, at an excessive price, it was immaterial, if true, that the trial judge misconceived the nature of the action, and erroneously took the position that proof of the alleged conspiracy was necessary, where the court not only found that there was no conspiracy, but also found that there was no fraud, and no intent to inflict a wrong, or to get an undue or

&⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

illegal profit, as its conclusions expressly negatived the facts upon which complainant would have had to rely to sustain a judgment in his favor under a correct understanding of the true nature of the action.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4035, 4036; Dec. Dig. ⊜⟶1029.]

4. CORPORATIONS ⊜⟶317(6)—LIABILITY OF DIRECTORS—PERSONS ENTITLED TO ENFORCE LIABILITY.

The general creditors of a corporation have as much right as stockholders or mortgage bondholders to be protected against the fraud and negligence of the directors, and have a right through a receiver to compel the directors to make good any loss resulting from the corporation's purchase of valueless parcels of real estate, if occasioned by the fraud or negligence of the directors.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1413, 1414; Dec. Dig. ⊜⟶317(6).]

5. CORPORATIONS ⊜⟶316(1)—DIRECTORS—PERSONAL TRANSACTIONS WITH CORPORATION.

While, strictly speaking, the directors of a corporation are not trustees, they are the agents of the corporation, and because of this fiduciary relationship the dealings of a director in his own right with the corporation are regarded with great jealousy and subjected to close scrutiny.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1401, 1402, 1405, 1406, 1409; Dec. Dig. ⊜⟶316(1).]

6. CORPORATIONS ⊜⟶314(1)—DIRECTORS—PERSONAL TRANSACTIONS WITH CORPORATION.

The position of directors of a corporation which had only five directors was one of great trust, and their character as agents did not permit them to exercise their powers against the interests of the corporation, its stockholders, or creditors, and they were bound to exercise good faith, and not to permit their official conduct to be swayed by their private interest, and they could not derive any individual advantage at the expense of the corporation and to the injury of its interests.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1393–1395; Dec. Dig. ⊜⟶314(1).]

7. CORPORATIONS ⊜⟶316(1)—DIRECTORS—PERSONAL TRANSACTIONS WITH CORPORATION.

A director is not disabled from selling his own property to his corporation, provided there are enough directors present who have no personal interest in the property, and the sale is open, fair, and honest.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1401, 1402, 1405, 1406, 1409; Dec. Dig. ⊜⟶316(1).]

8. CORPORATIONS ⊜⟶316(1)—DIRECTORS—PERSONAL TRANSACTIONS WITH CORPORATION.

If a director's sale of his own property to his corporation is not open, fair, and honest, the transaction can be set aside, and the director called upon to make good any loss inflicted upon the corporation.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1401, 1402, 1405, 1406, 1409; Dec. Dig. ⊜⟶316(1).]

9. CORPORATIONS ⊜⟶320(11)—DIRECTORS—ACTIONS FOR FRAUD OR NEGLIGENCE —SUFFICIENCY OF EVIDENCE.

In an action against directors of a corporation for an accounting and damages, evidence *held* insufficient to show that the price at which real estate owned by one of them and other real estate in which others of them had a beneficial interest was sold to the corporation was grossly excessive, or that they acted fraudulently or negligently, notwithstanding a large difference between the income which the sellers were obtaining

⊜⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

from such property and the interest on bonds of the corporation delivered in payment for the property.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1437; Dec. Dig. ☞320(11).]

**10.** CORPORATIONS ☞316(1)—DIRECTORS—PERSONAL TRANSACTIONS WITH CORPORATION.

Directors of a corporation, when dealing with themselves, must be scrupulous to see that they do not involve the corporation in a transaction unfair or not advantageous to it, and are bound to look out for the interests of the corporation.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1401, 1402, 1405, 1406, 1409; Dec. Dig. ☞316(1).]

**11.** CORPORATIONS ☞320(11)—DIRECTORS—DEALINGS WITH CORPORATION—BURDEN OF PROOF.

The burden is on directors of a corporation, dealing with themselves, to show that the transaction was perfectly fair to the corporation.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1437; Dec. Dig. ☞320(11).]

Appeals from the District Court of the United States for the Southern District of New York.

Suits by Silas W. Howland, as receiver of the Improved Property Holding Company of New York, against Henry Corn and others, and by the Empire Trust Company, as trustee under a mortgage of the Improved Property Holding Company of New York, against the Improved Property Holding Company of New York and others. From a decree dismissing the bill of complaint in the first suit, the complainant appeals; and from a decree for the complainant in the second suit the defendants the Improved Property Holding Company of New York and Silas W. Howland, receiver, appeal. Affirmed.

The first cause is a suit brought by a receiver against the directors of the corporation of which he has been appointed receiver, to establish a personal liability on the part of the defendants for reasons which are hereinafter more fully stated. The second cause is a suit for the foreclosure of a mortgage in which the same receiver appeared and answered, setting up the invalidity of certain bonds issued under the mortgage in foreclosure. In the first suit the receiver alleges as a portion of his cause of action the same facts asserted to show invalidity of the bonds in the second and which are relied upon to establish a personal liability of the defendants in the first suit. The two actions were tried together in the court below and were disposed of in a single opinion.

Separate decrees were entered—in the first suit, on January 11, 1915; in the second suit, on August 6, 1914; and on February 4, 1915, a supplemental decree was filed. The trial court dismissed the bill of complaint in the first suit, having found that the directors, the defendants, had been honest in their dealings with the corporation. In the second suit the mortgage made by the Improved Property Holding Company to the Empire Trust Company as trustee, dated May 24, 1909, was adjudged valid, coupon bonds to the face value of $1,000,000 were adjudged duly issued, and $223,000 face value of these bonds were adjudged duly redeemed by payment in cash, and $777,000 face value of the bonds were adjudged outstanding, legal, and unpaid obligations of the company secured by the mortgage. And the prayers contained in the answer of the receiver were denied. An appeal has been taken in each suit. The two cases were argued together in this court.

The Improved Property Holding Company is a corporation organized and existing under the laws of the state of New York. It was organized to acquire and hold improved business properties in the borough of Manhattan.

The complainant in the first suit was appointed by the District Court for the Southern District the receiver of the Improved Property Holding Company, and of all the property and assets of that company not covered by its mortgages dated June 1, 1906, and May 24, 1909. The General Realty & Mortgage Company is a corporation organized and existing under the laws of the state of New York, having its principal office in the city of New York. The defendants in the first suit, with the exception of the General Realty & Mortgage Company, constituted the board of directors of the Improved Property Holding Company; Corn being president of the company, Ball and Dowling vice-presidents, and O'Donohue treasurer and secretary.

At all the times mentioned in the complaint in the first suit, Ball and O'Donohue are alleged to have been officers and directors of the General Realty & Mortgage Company and are said to have controlled its affairs, holding a majority of the stock. Out of 10,000 shares of the stock Ball, it is alleged, held 4,800 shares, O'Donohue more than 1,000 shares, and O'Donohue's wife, brother, and brother's wife owned in the aggregate 3,000 shares. It is alleged that prior to May 24, 1909, Corn, Ball, O'Donohue and the General Realty & Mortgage Company, through its officers and directors, entered into a combination and conspiracy to cause the Improved Property Holding Company to issue and deliver its negotiable 6 per cent. coupon bonds, secured by a mortgage on its property, in the aggregate principal amount of $1,000,000, without receiving fair or adequate consideration therefor; to obtain for themselves $555,000 face value of said bonds, without giving any fair or adequate consideration therefor, and upon terms grossly inequitable, burdensome and unconscionable as to said Improved Property Holding Company and greatly to the advantage of said Corn, Ball, and O'Donohue, and said General Realty & Mortgage Company; to obtain for themselves large sums as interest on said bonds; to transfer from said General Realty & Mortgage Company and said Corn to the Improved Property Holding Company certain unprofitable and rapidly deteriorating parcels of real property, known as No. 476 Broadway and No. 395 Broadway, respectively, in the borough of Manhattan, city of New York, and to shift from the General Realty & Mortgage Company and said Corn to the Improved Property Holding Company the burdens and obligations incident to the operation and ownership of said properties; and to obtain for themselves large sums of money through the ownership of the bonds to be issued, both by selling or otherwise disposing of some of the bonds, and by causing many of the bonds to be redeemed at a premium and otherwise. Pursuant to the combination and conspiracy and with such purpose and intent as aforesaid, the said Corn, Ball, and O'Donohue, and the General Realty & Mortgage Company through its officers and directors, are said to have devised and consummated the wrongful and illegal scheme and schemes hereinafter set forth.

It is alleged that pursuant to this illegal conspiracy the defendants caused a meeting to be held of the directors of the Improved Property Holding Company to authorize the execution of a mortgage dated May 24, 1909, by the Improved Property Holding Company to the Empire Trust Company as trustee, covering all the property then owned by said Improved Property Holding Company, and also to authorize the issue, ostensibly for the purpose of securing capital for the transaction of the business of the Improved Property Holding Company and also for other lawful purposes of its incorporation, of $1,000,000 face value of 6 per cent. coupon bonds of the Improved Property Holding Company, secured by said mortgage, and that they further and in like manner and with such purpose and intent as aforesaid caused the board of directors of the Improved Property Holding Company to authorize and direct the purchase by the Improved Property Holding Company from the General Realty & Mortgage Company and from Henry Corn, respectively, of the premises known as No. 395 Broadway and No. 476 Broadway, respectively, both situated in the borough of Manhattan, city of New York, for $555,000 face value of said bonds, $450,000 face value of said bonds to be issued to the General Realty & Mortgage Company for premises No. 395 Broadway, subject to a mortgage to secure the principal sum of $750,000 and interest, and $105,000 face value of said bonds to be issued to Henry Corn for premises known as No. 476 Broadway, subject to mortgage to secure principal sums ag-

gregating $545,000 and interest. It is alleged that defendants Dowling and Barlow were negligent and remiss in the discharge of their duty as directors of the Improved Property Holding Company and that they failed to exercise the degree of care which an ordinarily prudent and diligent man would have exercised under like circumstances in voting for the purchase of premises 395 and 476 Broadway.

The various acts set forth in the complaint are alleged to have been wrongful and illegal, and it is averred were all parts of and constituted a wrongful and illegal conspiracy and scheme on the part of the defendants Corn, Ball, O'Donohue, and the General Realty & Mortgage Company to derive benefit and profit for themselves at the expense, regardless of the rights and interests, and in violation of the rights and interests, of said Improved Property Holding Company of New York, and in violation of the trust and confidence reposed in said Corn, Ball, and O'Donohue, as officers and directors of the Improved Property Holding Company. The defendant General Realty & Mortgage Company is alleged to have participated in the conspiracy, and as the tool and dummy of the defendants Ball and O'Donohue to have had no independent object and interest, but to have been completely subservient, at all the times and with respect to all the acts mentioned, to the said Ball and O'Donohue. It is also alleged that each of the defendants became liable to account for all moneys and property received by him or it by reason of the unlawful acts complained of, and that all of the defendants became jointly and severally accountable and liable to pay to the complainant as receiver of the Improved Property Holding Company full compensation for all loss and damages incurred by the Improved Property Holding Company and its creditors, by reason of the wrongful and illegal acts charged.

The complainant asks that it be adjudged that none of the $555,000 face value of the bonds, and none of the interest coupons thereto appertaining, issued for the acquisition of the premises No. 395 Broadway and No. 476 Broadway, are valid or enforceable obligations of the Improved Property Holding Company, or entitled to any part of the security of the lien of its mortgage dated May 24, 1909, except such of said bonds and coupons as have come into the hands of purchasers for a valuable consideration without notice. The complainant also asks that the defendants be compelled to account before a master and that each of them be decreed to pay to complainant all moneys paid to them by the Improved Property Holding Company as interest upon any of said $555,000 face value of the bonds alleged to have been wrongfully and illegally issued, and of all moneys paid to them for the redemption of any of the bonds, and of all moneys and property received by them, or any of them, in return for the transfer, hypothecation or other disposition by them, or any of them, of any of the bonds. Damages and an injunction are also asked.

The defendants deny various material allegations of the complaint and ask a decree establishing the validity of the bonds, $555,000 face value, issued by the Improved Property Holding Company to Corn and the General Realty & Mortgage Company.

William M. Chadbourne, of New York City (Henry L. Stimson, William M. Chadbourne, and Minturn De S. Verdi, all of New York City, of counsel), for appellant receiver.

Rosenthal & Heermance, of New York City (Clayton J. Heermance, of New York City, of counsel), for appellee Corn.

Guy Van Amringe, of New York City (George E. Hargrave, of New York City, of counsel), for appellee Barlow.

Lyttleton Fox, of New York City, for appellees Ball and others.

Roger Foster, of New York City, for appellee Dowling.

Before LACOMBE, COXE, and ROGERS, Circuit Judges.

ROGERS, Circuit Judge (after stating the facts as above). The receiver of an insolvent corporation sues to recover for the injury he

claims the defendants inflicted upon the Improved Property Holding Company of New York, hereinafter called the company, by their fraudulent and negligent conduct while acting as directors thereof. This is the first of the two suits and will be the first considered. The second suit is substantially between the same parties and substantially raises the same issues, so that the conclusion reached in the first suit will enable us readily to dispose of the questions involved in the second.

In the first suit the bill was dismissed because the court below did not believe that any conspiracy to defraud the company had been entered into by those of the defendants who were alleged to have conspired to bring about the unlawful result, and also because the court did not believe that defendants Dowling and Barlow (who were not charged with conspiracy or fraud) had not been guilty of a failure to exercise that reasonable degree of care which as directors of the company they were bound to give in the discharge of their duties.

The counsel for appellant argued in this court that the court below had misapprehended the nature of the suit and mistakenly assumed that conspiracy meant the same in civil suits as in the criminal law, and that this misconception of the District Judge as to the nature of the action pervaded his whole opinion. This error, it was said, went to the very root of the decision, and it was claimed that the court did not recognize the fact that the suit was based, not upon a conspiracy, but upon the action of the directors in selling to the company, upon terms unfair to it, properties in which they were personally interested. It is true the court below said:

"It cannot be too strongly insisted that this bill as against these defendants counts only upon a conspiracy."

It was also said:

"Taking the whole bill, it is impossible to say that its prayers can prevail against the defendants other than Dowling and Barlow, unless a conspiracy be shown."

[1, 2] There can be no question, we take it, but that an averment that acts were done in pursuance of a conspiracy does not change the nature of the civil action or add anything to its legal force and effect. In a criminal prosecution for conspiracy the unlawful combination and confederacy constitute the essential element of the offense rather than the overt acts done in pursuance of it. But that doctrine does not apply to civil suits for actionable torts. Green v. Davies, 182 N. Y. 499, 503, 75 N. E. 536, 3 Ann. Cas. 310. In the civil action, if the conspiracy is not made out, the allegation may be disregarded as surplusage. Perry v. Hayes, 215 Mass. 296, 102 N. E. 318. The rule is correctly stated in 8 Cyc. 647:

"If a plaintiff fail in the proof of a conspiracy or concerted design, he may yet recover damages against such of the defendants as are shown to be guilty of the tort without such agreement. The charge of conspiracy, where unsupported by evidence, will be considered mere surplusage, not necessary to be proved to support the action."

[3] If the court below misconceived the action, the opinion rendered distinctly makes it evident that, if it had apprehended the true nature

of the action, the decision would have been exactly the same as that which it in fact rendered; for the conclusions which the court reached expressly negatived the facts upon which the complainant would have had to rely to sustain a judgment in his favor under a correct understanding of the true nature of the action. The court below not only found that there was no conspiracy, but it found that there was no fraud, no intent to inflict a wrong, or to get an undue or an illegal profit. The court was convinced that the defendants honestly believed that the properties involved were worth the values which justified them in the action taken. The court also found that they exercised as directors the degree of care and caution which the law required. In view of these respective findings it is altogether beside the case to claim that the District Judge fell into an error which affected the judgment to the appellant's prejudice.

This brings us to a more particular consideration of the facts as we find them upon the record. The company over which the receiver was appointed is a hopelessly insolvent concern. It was organized in 1906 to acquire and hold improved business properties in the borough of Manhattan in the city of New York and to collect the rents therefrom. The defendants, Corn, Ball, Dowling, O'Donohue, and Barlow constituted its board of directors. Corn was made president. The company, immediately upon its organization, acquired from Corn nine leaseholds of office and loft buildings. These on June 1, 1906, it mortgaged to the Colonial Trust Company as trustee to secure an issue of $1,000,000. This mortgage is known as the "A" mortgage. All of these bonds were issued between June 1, 1906, and January 1, 1908. The amount of these bonds still outstanding is stated to be $637,000, the remainder of the issue having been redeemed. The company subsequently acquired four additional leaseholds. The thirteen leaseholds thus held were carried on the books of the company on May 1, 1909, at a total valuation of $3,582,232.55, subject to underlying mortgages aggregating $1,080,000 and to the "A" bonds, of which $910,000 were then outstanding. The directors believed that there was a considerable equity in the "A" leaseholds over the "A" mortgage. The "A" leaseholds, acquired from Corn, were prosperous and were operated by him under a contract with the Holding Company whereby he agreed to turn over to the latter a net sum therefrom of $250,000.

On May 26, 1909, the directors held a board meeting and adopted two resolutions. The first related to the purchase of the property known as 395 Broadway, in the borough of Manhattan and it reads as follows:

"Resolved, that this company purchase the premises No. 395 Broadway from General Realty & Mortgage Company, subject to an existing mortgage of $350,000 and interest for $450,000, payable in its proposed new issue of bonds, and that in addition thereto it sell to General Realty & Mortgage Company $300,000, par value, of said issue of bonds, at 80 per cent. of the face value of which $250,000 par value shall be purchased as soon as the interim certificates therefor are ready for delivery, and the balance on or before August 1, 1909."

The second related to the purchase of the property known as 476 Broadway, also in the borough of Manhattan, and it reads as follows:

"Resolved, that this company purchase the premises known as No. 474–476 Broadway, from Henry Corn, subject to $545,000 of mortgage and interest thereon for the sum of $105,000 payable in said bonds, and that Henry Corn be offered the option of purchasing $100,000 additional of said bonds at 80 per cent. of the face value, within one year, unless the company require the money sooner, in which case it may require Henry Corn to exercise the option on 30 days' notice."

On these two resolutions these suits are based. At the meeting at which the above resolutions were adopted it was also voted to authorize the execution of a mortgage dated May 24, 1909, and known as the "B" mortgage. This mortgage was given to secure the payment of bonds to the amount of $1,000,000, dated June 1, 1909, and payable June 1, 1924, and bearing interest at the rate of 6 per cent. The mortgage ran to the Empire Trust Company as trustee. And at the same meeting the board authorized the sale to the General Realty & Mortgage Company of $300,000 face value of "B" bonds at 80.

The theory of the bill of complaint is that the defendants Corn, Ball, and O'Donohue and the General Realty & Mortgage Company entered into a combination and conspiracy to defraud the company and to unload on the latter certain real estate alleged to have been unprofitable and rapidly deteriorating property; that the General Realty & Mortgage Company owned No. 395 Broadway, and that Ball and O'Donohue owned the majority of the stock of the company and controlled its affairs; that No. 395 Broadway produced in 1909 a net income of only $11,757.47, with no allowance for depreciation; that in exchanging it for $450,000 face value of "B" bonds the General Realty & Mortgage Company (which was Ball and O'Donohue) obtained an annual interest charge of 6 per cent. on that amount, or $27,000; that the defendant Corn owned No. 476 Broadway, and that it was producing a net income of about $2,326.68 a year; that in exchanging it for $105,000 of the bonds bearing 6 per cent. interest Corn obtained $6,300 a year. The bill charges that the loss suffered by the company by the taking over of these two properties is in excess of $300,000. At the time these properties were purchased the board of directors consisted of five persons, and Corn, Ball, and O'Donohue were three of the five and voted for the resolutions, and in doing so sold their own property to the company at grossly excessive prices, to their own great private advantage and with disastrous results to the corporation.

The theory of the complaint as respects the other two defendants, Dowling and Barlow, is materially different. They also were present at the meeting of the board of directors when these two properties were purchased by the company and they voted in favor of that action. It is not, however, claimed that either of the two was guilty of any fraud, or was engaged in or cognizant of any alleged conspiracy, or that their personal interests were adverse to or in conflict with those of the corporation of which they were directors, or that they were attempting to derive an individual benefit at the expense of their corporation. The charge against them is that they were negligent in the discharge of their duties as directors, that they voted to take over those properties without ascertaining the assessed value of the properties for the purpose of taxation, and that they failed to obtain an in-

dependent appraisal of each of them, and also failed to ascertain the net income of each for the period preceding the date of the resolution for their purchase.

[4] The acts of which the receiver complains have never been complained of by any of the stockholders of the insolvent company; neither have any of the bondholders complained, although the wrongs, if wrongs they were, were committed in May, 1909. The only complaint ever made is that made by the receiver representing the general creditors. The general creditors, however, have as much right as the stockholders or the bondholders to be protected against the fraud and negligence of the directors, and they have a right through the receiver to compel the directors to make good any loss which resulted from the purchase by the company of valueless parcels of real estate, if it appears that the loss was occasioned either by the fraud or the negligence of the defendants.

[5] In Koehler v. Black River Falls Iron Co., 2 Black, 715, 721, 17 L. Ed. 339 (1862), the Supreme Court of the United States laid down the principle that the directors of a corporation are trustees for the stockholders, and that if they secure to themselves advantages which are not common to all the stockholders they are guilty of a breach of trust which the courts of equity will remedy. While strictly speaking the directors are not trustees, not being clothed with legal title to the property which is vested in the corporation, they are the agents of the corporation, and because of that fiduciary relationship the dealings of a director in his own right with the corporation are regarded with great jealousy and subjected to close scrutiny. In Twin-Lick Oil Co. v. Marbury, 91 U. S. 587, 590, 23 L. Ed. 328 (1875), the Supreme Court, speaking through Mr. Justice Miller and referring to the necessity in all such cases of candor and fair dealing, says:

"If he should be a sole director, or one of a smaller number vested with certain powers, this obligation would be still stronger, and his acts subject to more severe scrutiny, and their validity determined by more rigid principles of morality and freedom from motives of selfishness."

[6] In the case at bar, with a board of directors limited to five, the position which the defendants held was one of great trust. They were clothed with power to manage the affairs of the corporation for the benefit of its stockholders and creditors. Their character as agents did not permit them to exercise their powers as directors against the interests of the corporation, its stockholders, or its creditors. In common with all directors, the defendants were bound to exercise good faith, and not to permit their official conduct to be swayed by their private interest. They could not derive any individual advantage at the expense of the corporation and to the injury of its interests.

[7, 8] The defendant Corn was the owner of No. 476 Broadway, and sold it to the Holding Company, although he was one of its directors. The General Realty Company was the owner of No. 395 Broadway, and sold it to the Holding Company, although two of the directors of the latter, defendants Ball and O'Donohue, were large stockholders in the General Realty Company. O'Donohue was a di-

rector of the latter company, and he and his family owned a little less than a half of its capital stock at the time of this sale; and Ball testified that he owned nearly half of the stock of the same company. Ball and O'Donohue were selling a property which they in part beneficially owned, and Corn was selling a property which he legally owned, to a corporation of which they were directors. Whether they had the right to do what they did depends on the circumstances of the case. A director is not disabled from selling his own property to his corporation, provided there are enough directors present who have no personal interest in the property and the sale is open, fair, and honest. See Broughton v. Jones, 120 Mich. 462, 79 N. W. 691. If it is not open, fair, and honest, the transaction can be set aside, and a director can be called upon to make good a loss inflicted upon the corporation by his breach of trust. There was in the case at bar, however, no concealment as to the real ownership of either of these properties. And we have not found any fraudulent conduct on the part of Corn, Ball, or O'Donohue, in respect to the sale. Ball testified that the result of the transaction, the sale of these properties to the company, was a very serious loss to himself; that his individual loss was in excess of $100,-000. O'Donohue testified that the transaction had been a very heavy loss to him; and Corn testified that the transaction cost him about $600,000.

[9] We think upon the record that the complainant has failed to establish the fact which he alleged that the defendants sold their properties to the company at what could be regarded at the time as grossly excessive prices. Upon this question it is necessary to refer to the testimony of the experts, although we do not deem it necessary to consider their testimony at any great length. There were six of these witnesses, and one of them, Coleman, testified that he had bought and sold for his own account more real estate in the city of New York than any other private individual that he knew of, and mortgage loans running up into hundreds of millions of dollars had been made on his appraisals. He had been for years general appraiser for the Mutual and Equitable Life Insurance Companies, as well as real estate examiner for the state superintendent of insurance, and appraiser at large for the city of New York. It is quite unlikely that the opinion of any one else as to the value of the properties sold to the company could be more valuable, or that he would express upon the witness stand anything but his mature, deliberate, and honest opinion. This witness testified that on May 16, 1909, the date these properties were taken over by the company, he valued No. 395 Broadway as worth $1,113,000, and No. 476 Broadway at from $600,000 to $610,000. The valuation which the defendants had put upon the properties at the time of the transfer were for No. 395 Broadway $1,110,000, and for No. 476 Broadway $629,000. Another of the experts had placed an estimate of $1,200,000 upon one of the properties, and $650,000 upon the other. Another estimated one at $1,138,745, and the other at $636,625. It is true that the experts for the complainant place a much lower estimate upon the properties; but we see no reason why their opinions should be preferred over the opinions of the experts called by the defendants, and who had had a

wider experience, and whose fairness and impartiality we see no reason to suspect.

In this connection the fact is not to be overlooked that the Equitable Life Insurance Company had loaned on No. 395 Broadway the sum of $750,000, and had in 1906 renewed the loan for five years at 4 per cent. The Mutual Life Insurance Company had loaned $420,000 on No. 476 Broadway. These companies were as a matter of law permitted to loan up to and not exceeding two-thirds of the values of the properties upon which they loaned. If we assume that these mortgages were as large as the lenders could legally make them, the properties must, in the opinion of the insurance companies, have been worth at least $1,125,000 and $630,000 at the time the loans were made. The panic of 1907 led to a fall in the value of real estate, and these companies might not have loaned in 1909 the same amount on these properties they had loaned a few years before. But whether they would or not is not disclosed by the record.

In this connection it is observed that in 1902 when the General Realty & Mortgage Company acquired No. 395 Broadway, it paid for it $1,200,000, by taking it subject to a mortgage of $850,000, paying $250,000 in cash, and trading in the equity of the property No. 598 Broadway at a valuation of $100,000.

The complainant's counsel has laid great stress in the argument in this court upon the fact that according to the figures produced by the defendant's accountant the net income from No. 395 Broadway for the year ending January 31, 1909, after paying interest on the mortgage on the property, was only $11,757.47, and for the six years from January 31, 1903, to January 31, 1909, the average yearly income was $15,959.75. The average yearly income during the same period, computed from the tables of the accountant called by the complainant, was $13,145.75. The total rent roll for the year 1909 from that property was $84,330. The gross annual rentals from No. 476 Broadway were between $45,000 and $46,000 in 1909, and complainant asserts that the yearly net income was $2,326.68. The argument then is that there must have been fraud in this transaction because the company gave its bonds in exchange for No. 395 Broadway, the interest charge on the bonds being $27,000 per annum, while the net income the property returned was less than $12,000 for the year 1909; and that the company in like manner gave its bonds for No. 476 Broadway, obligating itself to pay an interest charge of $6,300 per annum, while the net income the property returned was something less than $2,400. We concede the force of the argument, although we do not accept it as conclusive. The testimony of the experts shows that it is not conclusive, and that the relation between the income of these properties and the interest on the bonds given in exchange for them is not decisive of the question of the real value of the properties, or of the good faith of the parties to the transaction.

The sale by Corn of No. 476 Broadway was not the only sale made by him to the company. Indeed, that company had been organized to take over his holdings. The nine leaseholds already mentioned, and which the "A" mortgages covered, originally belonged to Corn and were sold

by him to the company. He originally owned all the stock of the company, although subsequently dividing some portion of it among the other directors and bond purchasers. There is no allegation that there was anything irregular or fraudulent in the conduct of Corn as to the sale of the "A" leaseholds. It appears that shortly after the incorporation of the company in 1906 there was an issue of what is known as the "A" bonds, amounting to $1,000,000, to which reference has already been made. In 1909 funds were needed to pay off $100,000 of these bonds, which matured on June 1st of that year, and money was also needed in the construction of the buildings being erected on certain properties of the company. This bond issue was authorized to provide the necessary funds, and it was agreed to take over No. 395 and No. 476 Broadway, as the fee of these properties could be obtained and Mr. O'Donohue was not willing to go ahead and invest in bonds secured only by leaseholds. Mr. O'Donohue was not then in the company, but had expressed a willingness to go in if some fee properties were acquired; and upon its being agreed that such properties should be acquired he became a director and took a large issue of the bonds. On becoming a director he voted with the other directors for the issue of the "B" bonds and the purchase of the fee properties complained of in this suit. As he had agreed to take a large amount of the bonds, he became a director, so that he could look after his interests and "see how things were going to go." The fee properties then purchased were the only fee properties the company possessed.

At the time these transactions occurred Corn was known as about the most successful real estate operator in New York City. At the same time Dowling had the reputation of being one of the best informed real estate men in the city. Ball had a similar reputation. Dowling testified that:

Ball did the largest business in loft buildings, in big deals, of any man in New York City; "he did more, sold more, and represented more purchasers than any other man" he knew, and he considered him "the best posted real estate broker in New York City on Broadway and the loft district."

He also testified that Ball was a man of the highest personal habits and character. He testified that:

He thought "Corn was the best man on that class of property, of loft buildings, in the dry goods district; he built more of them, and had sold more of them, and had rented more of them, and knew more about renting conditions, than any other man in New York City. I went in and put my money in this company on the strength of his ability to rent those properties, as well as his ability to build them and handle them."

He stated that he had known O'Donohue for a great many years and that his reputation was first class.

Corn's testimony as to his own opinion concerning those transactions was as follows:

"Q. Was there any doubt in your mind, at the time of the transfer of 395 and 476 Broadway, that the amount at which the company took these properties in was a fair valuation for the properties? A. No, sir. Q. Did you have any reason to believe that there was anything the matter with these properties, or the neighborhood in which they were located? A. Absolutely not. Q. Did you have any notice of any so-called exodus or migration? A.

Never. To the contrary, we had a lease made in 1909, which your books will show expired in the beginning of 1910, for that store in the basement, which was then leased for $9,000, and a new lease was made at an advance of $1,000 a year; $10,000. Q. Where was that? A. 474–476 Broadway. Q. When was that made? A. 1909, to take effect in 1910, and thereafter for five years. Q. Was that after the transfer of the properties to the company? A. Yes, sir. Q. At the time of the transfer of the properties to the company, was the building fully occupied? A. Absolutely complete; full tenancy. Q. Have you ever had vacancies there? A. Never had a vacancy there. Q. Can you tell us about what the net return was from the rents in that building? A. I think they were, as near as I can remember, somewhere between $45,000 gross and $46,000 per annum. Q. What were the net returns? A. About $7,000 to $8,-000 a year; somewhere in between $7,000 and $8,000 a year net."

He was also asked:

"Q. At the time that you made this transfer to the company, Mr. Corn, did you consider that you were defrauding the company? A. It cost me about $600,000. Q. Is your answer 'No'? A. No. Q. At the time of this transfer did you conspire with any one to take any benefit from the Improved Property Holding Company? A. No, sir. Q. At the time of this transfer, Mr. Corn, did you have any intention of defrauding the Improved Property Holding Company, or any one? A. No."

Corn was asked whether he thought the building at No. 395 Broadway was a proper improvement for the neighborhood and answered in the affirmative:

"I think," he said, "that it is the finest structure to-day on Broadway, from Fourteenth street south to this building."

And at that time Corn bought some 1,500 or 1,600 additional shares of the stock of the company, paying $65,000 in cash for them, which brought his holdings of the stock of the company to nearly 9,000 shares. His faith in the "B" bond issue is shown by the fact that he exchanged at that time $100,000 "A" bonds for "B" bonds, although the "A" bonds were selling in the open market for 108, and at the time of this trial he still held every one of his bonds.

Barlow testified that he relied in part on what Corn, Dowling, and Ball told him. He relied particularly upon the judgment of Dowling, believing him to be a disinterested party. Barlow had personal knowledge of the construction of the building at No. 395 Broadway and after he knew that the purchase of that property was contemplated he made a special visit to the building to acquaint himself more fully as to its character. He made a like inspection of the property at No. 476 Broadway. His testimony shows that he believed at the time he voted for the resolutions of purchase that the buildings would within a reasonable time earn enough rentals to carry the charges; and it appears that before voting for the purchase he inquired as to the rentals that were being paid at that time. The idea was in his mind, as it was in the mind of the others, that No. 395 Broadway could be used as an office building, and that, so used, it would produce higher rentals than it was then bringing in. He thought it could be converted into an office building and that this would greatly raise the square foot rental.

Dowling has very extensive real estate holdings in the borough of Manhattan and has acted in numerous proceedings as an appraiser. He was familiar with No. 395 Broadway before it was proposed to

purchase it. He testified that he thought it one of the best-looking and best-built store and loft buildings he had ever seen, and believed it at the time to be worth somewhere from $1,125,000 to $1,150,000. He was thoroughly familiar with the property at No. 476 Broadway and thought it worth all the company paid for it.

Ball was interested in the company from its inception. He testified he believed the valuations at which No. 395 and No. 476 Broadway were taken over were very fair valuations, and that at the several meetings of the board that were held to consider the purchase of the properties the value to be placed upon them had been the subject of discussion, and that at the time of the purchase he knew of the appraisement of $1,155,000 placed by Coleman on No. 395 Broadway. He was asked if he ever had any idea of defrauding anybody, and replied he had not. As he was a director in both the company and the General Realty & Mortgage Company, he felt that he had special responsibilities resting on him. He testified that he had not expected at that time that there was going to be any dropping off of values on lower Broadway in the neighborhood of these properties.

O'Donohue testified that he believed the price of $1,110,000 for which No. 395 Broadway was to be taken over by the company was a fair valuation, and that he had taken steps at the time to inform himself respecting the matter, and that he had gone to Coleman, regarded by him as the best-qualified real estate expert in New York, and asked him to appraise the property personally for him, and that he was to a very large extent influenced by his appraisement of it at $1,155,000. He also testified, as respects No. 476 Broadway, he was influenced by the opinion entertained by Corn and Dowling as to its value. He thought the taking over of these properties was as fair and honest an arrangement as could be made, and that he had no idea that by entering into it he would be taking advantage of any of the stockholders.

The testimony also shows that the defendants believed the price at which the bonds were taken over was a very good price for the company. They were taken over at 80, and the company had been trying to sell them for that in the market, but without success.

We have read the voluminous record with care, and we are unable to discover that these defendants have acted fraudulently or negligently. Throughout they appear to us to have acted in these various transactions in good faith and with honest intentions. The fact that they were mistaken in some of their judgments and that losses resulted to the company from such mistaken judgment, does not, under the circumstances disclosed in the record, entitle the trustee to maintain this suit.

[10, 11] The rule is of course well established that directors of a corporation, when dealing with themselves, must be scrupulous to see that they do not involve the corporation in a transaction which is unfair or disadvantageous to it. They are certainly bound to look out for the interests of the corporation, and the burden is on them to show that the transaction was perfectly fair. In this case we think these defendants have sustained the burden which the law imposes upon them. In what they did they were not seeking to secure to themselves as in-

dividuals undue advantages at the expense of this company. If they had sought such private advantages, it would be the duty of this court to see that they made good the injury which they had caused.

This brings us to a consideration of the second suit. That was brought by the Empire Trust Company, as trustee under the mortgage made by the company (Improved Property Holding Company) on May 24, 1909, to which reference has already been made in this opinion. The receiver of the company, the mortgagor, appeared and answered, setting up the invalidity of certain of the bonds issued under the mortgage. The receiver relies upon the same facts to show the invalidity of the bonds that he relied upon in the first suit to show the personal liability on the part of the defendants in that suit. For reasons already stated, and which caused the receiver's failure to recover from the defendants in the first suit, his attempt to establish in the second suit the invalidity of certain of the bonds must also fail.

The decrees in both cases are affirmed.