Mr. Justice DAVIS.
 

 This was a bill in chancery, brought in the District Court of Wisconsin by Jacob Koehler, Daniel Koehler, and Harry Pfiffner against the “ Black River Falls Iron Company,” to forclose a mortgage.
 

 
 *716
 
 The bill alleges that, on the 13th of August, 1858, at La Crosse, in Wisconsin, the “Black River Falls Iron Company”— a corporation created by the laws of Wisconsin — executed and' delivered their promissory note to Daniel Koehler and Caspar Bircher for $15,000, payable in nine month, to secure which a mortgage of even date, under the corporate seal, was also executed and delivered — which mortgage was witnessed, acknowledged, and recorded; that on the 21st day of September, 1858, Casper Bircher, by an instrument of writing under seal, for the consideration of $7,000, transferred to Jacob Koehler and Henry. Pfiffner his interest' in said note and mortgage, which was also witnessed, acknowledged, and recorded; and that; the note and motjgage being over due and unpaid, the aid of the Court, is asked to. decree a foreclosure.
 

 William M. Hubby, having filed his petition stating that he was a stockholder, and that in his opinion theiidirectors did not intend to make defence, was allowed to appear and- defend. Leave was given to the complainants to amend their bill so as to make Julius W. Haas and others, junior mortgagees, party defendants. Answers and replications were filed, proofs taken, and the cause was heard at the October Term, 1860. The-Court dismissed the bill without prejudice and the complainants appealed.
 

 The answers deny that the “Black River Falls Iron Company ” ever executed under its corporate seal this mortgage; which denial, if sustained by the evidence, is decisive of this case. If the seal of the corporation was not affixed to the instrument by proper authority, but was surreptitiously obtained, then the deed is not the deed of the corporation, was not duly executed as the bill charges, and is not a legal mortgage, and cannot be fore closed as such.
 

 The-mere fact that a deed has the corporate seal attached, does not make it the act of the corporation, unless- the seal was placed to it by some one duly authorized.
 
 Jackson
 
 vs.
 
 Campbell,
 
 (5 Wendell, 572);
 
 Damon
 
 vs.
 
 Granby,
 
 (2 Pick., 345,
 
 353); Bank of Ireland
 
 vs.
 
 Evan,
 
 (32 Eng. L. & E., 23); (Angell and Ames on Corporations, Sec. 223).
 

 
 *717
 
 This mortgage had. the corporate seal attached, and the prestimption was that it was there rightfully, and the Court property, admitted it to be read in evidence; but the presumption thus raised was not conclusive, .-and parol evidence was admissible to overthrow it.
 
 St. Mary's Church,
 
 (7 Serg. & R., 530);
 
 Berks & Dauphin Turnpike
 
 vs.
 
 Myers,
 
 (6 Serg. & R., 16.)
 

 The evidence is conclusive that. th&norpoTatejeal was affixi.d to the mortgage_wrongfully.
 

 ' "The 'mortgage purports to have been executed on the 13th of August, 1858, and signed by Charles Hauser, president, and J. M. Levy, Secretary
 
 pro tem.,
 
 who both swear-that the corporate •seal was not present, that they did not then, nor did they ever place the seal to the instrument, and have no knowledge how it came to be sealed. It was recorded shortly after being given, and no seal was to it.
 

 Henry Richter, the secretary of the company, was the custodian of the seal, and testifies that he was not present when the mortgage was given, that he had the seal in his possession,' and did not then, or at any time afteiwards, affix the seal or authorize any one to do it for him.
 

 When the defendants proved that neither the President nor the Secretary
 
 pro tem.,
 
 who signed the mortgage, nor the regular Secretary, who was the rightful custodian of the seal, had any knowledge of the way in which the mortgage became sealed, then the burden of proof was thrown on the complainants to show the circumstances under which the instrument was in fact sealed, and that it was rightfully and properly done.
 

 Failing to do so, the conclusion is irresistible, that the seal was fraudulently abstracted from the lawful custodian of it, and wrongfully affixed to the mortgage.
 

 The Revised Statutes of Wisconsin of 1849 were in force when this mortgage was given, and section 1 of chapter 59 prescribes the manner in which conveyances of real estate can be made, and it is as follows:
 

 “
 
 Conveyances of lands or of any estate or interest therein may be made by deed, signed and sealed by the person from whom the estate or interest is intended' to pass, being of lawful age, or
 
 *718
 
 by bis lawful agent or attorney, and acknowledged or proved and recorded as directed in this chapter, without any other cere mony whatever.”
 

 Section 80 of this same chapter defines what is meant by.conveyances as thus used, and is as follows:
 

 “The term conveyance, as used in this chapter, shall be construed to embrace every instrument in writing by which any estate or interest in real estate is created, aliened, mortgaged or assigned, or by which the title to any real estate may be affected in law or equity, except wills, leases' for a term not exceeding three years, and executory contracts for the sale or purchase of lands.”
 

 ■jl'1 G mortgage, not having been sealed by the Iron Company or uncmr its authority, was not executed in conformity with law, and is therefore invalid and of no force and effect as a legal mortgage.
 

 It is argued, that if not a legal mortgage, it is an equitable one, and that the Court should not have dismissed the bill, but granted such relief as equity could give. But
 
 this
 
 bill seeks a foreclosure on the
 
 sole
 
 ground that a legal mortgage was given.
 

 If the complainants have any rights under this instrument as an equitable mortgage, they can be tested, oh a proper bill filed, in another suit.
 

 The defendants in their, answers further insist that this mortgage was given without authority of law and by fraud and collusion on the part of the directors.
 

 The Black River Falls Iron Company was incorporated by the General Assembly of Wisconsin March 31st, 1856, to explore for minerals, and to mine, manufacture, and vend them. The administration of the affairs of the Company was lodged in the hands of directors chosen from the -stockholders to hold office for one year, and to be controlled by the rules and by-laws adopted by the stockholders. The power to sell and mortgage, and procure a common seal, was given.
 

 By-laws were adopted, fixing the place of business at New Danemora, Jackson County, limiting the number of directors to five, who should appoint a secretary having no vote, and pro
 
 *719
 
 viding “that all documents, orders for the payment of money and receipts, to be valid, must be signed by the President and Secretary.”
 

 A stockholders’ meeting was held May 19th, 1858, and the following memorandum was entered among the minutes:
 
 “
 
 May 19th, afternoon session — Mr. C. W. Schmidt makes the motion that the directory hereafter to be appointed shall be authorized to endeavor before all, the effecting óf a loan of the highest possible amount, and in case of success to close it, and they are empowered to incumber for the same the works with buildings and appertaining lands, carried.” At the same meeting a board of directors was elected, to wit: Charles Hauser, President, and John C. Fuhr, H. Pfiffner, Jacob Koehler, and John M. Levy, who chose Henry Richter as Secretary.
 

 The Company was evidently embarrassed and in great need of money, and as the necessity was urgent and pressing the directors were instructed (neglecting all other business) to obtain as large a loan as they could, and to secure it by a mortgage on the lands and works. The stockholders clearly contemplated a loan of money to carry on their business, and if a loan could not be affected without real security, power to mortgage was given to the directors. No authority was give a to them to secure pre-existing indebtedness, and certainly none to secure themselves in preference to other creditors.
 

 Did these directors, as guardians of an important trust committed to their care, endeavor, in good faith, to accomplish the object which their principals so much desired ?
 

 They met on the 13th day of August, 1858, at La Crosse, and not at their usual place of business, and failed' to notify their regular secretary, who had the records in his charge, and who had acted as secretary since the. organization of the Company, to attend. No reason is assigned why the secretary was not notified, but as he was a large creditor, and was'not to be favored, it is barely possible that the directors thought his presence would be embarrassing.
 

 As the by-laws required that all instruments of writing should be signed by the president and secretary, it was found necessary
 
 *720
 
 to appoint a secretary
 
 pro tern.,
 
 and one of the. directors was selected, who, nnlike the regular secretary, was fortunate enough to have his debt provided for.
 

 A note and mortgage were given to Daniel Koehler and Caspar Bircher for $15,000, who were to let the company have $1,200 in money, and $800 in provisions, and to pay the fol lowing debts of the corporation:
 

 Metzer, Koehler & Swab, a note and interest, . . $3,570
 

 John C. Euhr, . '......1,900
 

 Jacob Koehler,.........1,256
 

 John M. Levy, two notes and interest, . . $2,528
 

 Less $124 charged, .... 124— 2,404.
 

 John C. Euhr, Jacob Koehler, and John M. Levy, who were so lucky as to have their debts to the amount of $5,500 provided for, were themselves directors, and it might be inferred that Koehler, the director, was interested in the firm of Metzer, Koehler & Swab, but there is no evidence of .it. It is a little singular that the mortgagees, in order to get security for the $2,000 which they agreed to advance, were willing to assume the payment of $9,130. Such is not the usual course of dealing with those who in good faith make advancements and require security. The mortgage was signed and delivered by Hauser, the president, to Koehler, the director, for the mortgagees, who were neither of them present, and who did not actually make the advancements in money or provisions until some time afterwards. And Bircher, one of the mortgagees, as if to fix the true character of this transaction beyond cavil, in a few weeks from the giving of the deed, for the expressed consideration of $7,000, transfers his entire interest to Koehler and Pfiffner, two of the directors. Instead of honestly endeavoring to effect a loan of money, advantageously, for the benefit of the corporation, these directors, in violation of their duty, and in betrayal of their trust, secured their own debts, to the injury of the stockholders and creditors. Directors cannot thus deal with the important interests entrusted to their management. They hold a’place of trust, and by accepting the trust are obliged to
 
 *721
 
 execute it with fidelity, not' for their own benefit, but for the common benefit of the stockholders of the corporation.
 

 In executing this mortgage, and thereby securing to themselves advantages which were not common to all the stockholders, they were guilty of an unauthorized act, and violated a plain principle of equity applicable to trustees. “The directors are the trustees or managing partners, and the stockholders are the .cestuis que trust, and have a joint interest in all the property and effects of the corporation, and no injury that the stockholders may sustain by a fraudulent breach of trust can, upon the general principles of equity, be suffered to pass without a remedy.”
 

 Angel & Ames on corporations, edition 1861, sec. 312.
 
 The Charitable Corporation
 
 vs.
 
 Sutton,
 
 (2 Atkyns, 404.)
 
 Robinson
 
 vs.
 
 Smith, (3 Paige, 220.) Hodges
 
 vs.
 
 New England Screw Co.,
 
 (1 Rhode Island, 321.)
 
 York and North Midland Railway Co.
 
 vs.
 
 Hudson,
 
 (19 Eng. L. & E., 361.)
 

 The decree dismissing the bill is affirmed.