JOSEPH W. SYMONDS, and others, in Equity,

*vs.*

WESTON LEWIS, and another.

Cumberland.    Opinion January 5, 1901.

*Corporations.    Director.    Preference.*

The law does not permit a director of an insolvent corporation to take a conveyance of substantially all its available assets to secure a prior debt to himself, to the detriment of creditors.

In this case, property exceeding ninety-four thousand dollars belonging to the Richards Paper Company was conveyed to Moses, plaintiffs' assignor, by absolute bill of sale, but in fact as collateral security for a pre-existing debt to him, when the corporation was hopelessly insolvent; and included all its property, except its real estate and a comparatively small amount of bills receivable.    Moses was a director and treasurer of the company at the time.

*Held;* that the conveyance is void as against creditors of the corporation.

ON REPORT.

Bill in equity, heard on bill, answer, replication and proof.

This was a bill in equity brought by the plaintiffs, as assignees of Galen C. Moses of Bath, against the defendants as assignees of the Richards Paper Company of Gardiner.    Both assignments were at common law.

The case appears in the opinion.

*J. W. Symonds, D. W. Snow, C. S. Cook and C. L. Hutchinson,* for plaintiffs.

The vote of June 17, 1898, and bills of sale pursuant thereto, the acts of Richards, clerk of the company, in reference to the delivery of the property to Weeks as agent of Moses, the charging of all the property upon the books of the Richards Paper Company as sold to Moses, certainly as between the company and Moses vested the title to all the same in him; and Moses was entitled to hold, and your complainants, as his assignees, are entitled to hold as against the company, and its assignees at least, all said property

to the extent of the amounts directly due from said company to Moses, and also to the extent of any payments which he shall be compelled to make on account of his liability for the accommodation of the company. The defendants, who are simply the common law assignees of the Richards Paper Company, are not in any position to object to the validity of the vote and sale by the company to Moses. The defendants are mere assignees under a common law assignment, and their right is simply to take and distribute, in accordance with the terms of said assignment, the property therein conveyed to them. 1 Am. & Eng. Ency. of Law, p. 854; *Washburn* v. *Hammond*, 151 Mass. 142; *Newbert* v. *Fletcher*, 84 Maine, 413; *Smyth* v. *Sprague*, 149 Mass. 310; *Ballantyne* v. *Appleton*, 82 Maine, 574.

Under such assignment, these defendants would take no property which prior thereto had been conveyed by their assignor, even if such conveyance had been made with the express intention of giving preference to a single creditor, or in express fraud of creditors generally. *Buell* v. *Buckingham Company*, 16 Iowa, 284, and cases cited in the two opinions by Cole and Dillon, JJ.; *City of St. Louis* v. *Alexander*, 23 Mo. 483–527.

If the company was insolvent and the directors, including Moses, knew it, or were in position to know it, then it was competent for the company, and it had full legal right to prefer any one of its creditors, even one of its directors, for bona fide debts, and other creditors could not avoid such purpose except by proceedings in bankruptcy, or under some special statute. *First Natl. Bank of Easton* v. *Smith*, 133 Mass. 31; *Traders Bank* v. *Steere*, 165 Mass. 393; *Sawyer* v. *Levy*, 162 Mass, 191.

The fact that Mr. Moses was a director did not make it unlawful for him to receive security from the company for a bona fide debt. As stated in *Buell* v. *Buckingham*, supra, the fact that Mr. Moses was an officer in the corporation did not deprive him of the right to enter into competition with other creditors for the security of a debt justly and honestly due him from the corporation, and, a fortiori, of new debts he was proposing to assume for the corporation. The right of a director of a company to take security for a

bona fide debt due from the company to him must follow the right of such director to contract with the corporation.

There is nothing in law, or in equity, which forbids the directors of a corporation from contracting with it. *Railroad Company* v. *Claghorn,* 1 Spear's Eq. 562; *Twin Lick Oil Co.* v. *Marbury,* 91 U. S. 587; *Ryan* v. *Williams,* 100 Fed. Rep. 176.

*L. C. Cornish and M. S. Holway,* for defendant.

SITTING: WISWELL, C. J., EMERY, WHITEHOUSE, STROUT, FOGLER, JJ.

STROUT, J. In 1894, the Richards Paper Company had a pulp plant at South Gardiner which cost $360,000. It also had a mill at Skowhegan, which cost $68,000, but was valued in 1898 at $20,000 to $30,000, and under mortgage for $12,500. In 1896 a mortgage was placed upon the Gardiner plant to secure bonds to the amount of $150,000, of which $12,000 were issued, and the balance placed in hands of Galen C. Moses to use as collateral to the company's notes that might be given in its business, and were so used by him. The company lacked funds for a working capital, and Mr. Moses undertook to furnish them, as cash advances or by his personal indorsement of its paper. On August 1, 1894, the directors of the company voted that the manager be authorized to secure Mr. Moses on the products of the company, or on any supplies on hand or which should be purchased, for any personal indorsements he might make on the company's notes, and to pay him a commission of one per cent therefor, on the basis of four months' paper. This vote was never rescinded, but nothing was done under it, except paying the commission for his indorsements till near the time of the assignment of the company to the defendants, on August 30, 1898. From 1893, to the failure of the company in 1898, Mr. Moses was a director and treasurer of the company. During all this time the company appears to have conducted a losing business—its liabilities in excess of its assets, exclusive of real estate, increasing from $143,000 on January 1, 1897, to $200,900 on July 1, 1898. Meantime its debt to Moses for advances had grown to $35,000, and he was liable as indorser of

its paper in excess of $200,000—all of the $150,000 mortgage bonds, except $12,000 which had been issued, were pledged as collateral for the outstanding notes of the company. Mr. Moses became alarmed, and at his request a meeting of the directors was called and held on June 17, 1898. At this meeting Mr. Moses was desirous to be released, and to have a period fixed beyond which he should not be required to furnish funds for the company. At his urgent request, and after considerable objection and discussion, it was voted "that the clerk be authorized to sell to G. C. Moses the stock of logs and supplies owned by the company," and on the same day an absolute bill of sale to Moses was made of the logs and supplies, which included all the property of the company except its real estate, and accounts due amounting to $4,338.41. The property thus conveyed to Moses amounted to $94,912.26. Moses says this conveyance was as collateral security for his debt and for his liability as indorser of the company's notes, and was made in the absolute form partly to avoid a preference under the bankrupt law, in case bankruptcy should occur, and incidentally to protect the property from attachment by creditors. Henry Richards, clerk and manager of the company, says Mr. Moses expressly disclaimed a desire for a preference, and took the bill of sale to protect the property from attachment. George H. Richards, president of the company, says that Moses told him on September 5, 1898, that the assets transferred to him ought not to be applied to his personal debts, but should go to pay the company's debts for logs and supplies.

After the bill of sale to Moses, there was no visible change of possession of the property or its management. The stock was manufactured in the mill, the insurance was unchanged, the products shipped in name of the company, new supplies bought and billed in its name. All the product of the mill was shipped to one house—it was billed to that house in Moses' name, and checks for it returned to him, which he, in the main, if not entirely, passed to the credit of the company, and which went into the company's bank account. Certain entries of the transaction were made in the books of the company, and a formal delivery made,

but no indication of change was apparent to any general creditor, or to any one, outside the officers of the company.

At the time of this transfer, the corporation was hopelessly insolvent. Its plant at South Gardiner sold in the fall of 1899, when pulp was commanding an exceptionally high price, for $50,000. The plant at Skowhegan was valued at $20,000 to $30,000, the company's interest being the equity over a mortgage for $12,500. Its total assets did not exceed $166,000—while its total liabilities were $323,000. June 20, 1898, three days after the transfer of its assets to Moses, he and a number of stockholders and some of the directors, entered into a written agree-ment to use their efforts to re-organize the company with a view to put it on sound financial basis, and if that was not effected before August 1, 1899, that the property should be sold, Moses agreeing in the meantime to use his best efforts to furnish money and sup-plies to keep the mill running till that time, or until re-organiza-tion, or sale, if not prevented by attachment or other action of creditors.

August 30, 1898, the Richards Company assigned to the defend-ants and Moses assigned to the plaintiffs, who claimed to hold all the property covered by the bill of sale to Moses, and to exclude the defendants therefrom.

By arrangement between the parties the property was left in the hands of defendants, to be manufactured and turned into cash, the proceeds to be held to await determination of the rights of the parties. This was done, and defendants now hold $42,433.05 as the net proceeds. The complainants seek to have this sum paid over to them as assignees of said Moses.

The transfer to Moses cannot be upheld. At common law a debtor may prefer a creditor to the exclusion of others—but a dif-ferent rule prevails when the creditor is a director of an insolvent corporation debtor. The directors in such case are not strictly trustees for the general creditors, though sometimes so-called, but they owe them a duty, which is inconsistent with the taking of a security for prior indebtedness to their detriment. The assets of an insolvent corporation are a trust fund for its creditors. *Beach*

v. *Miller*, 130 Ill. 167. As said by Justice HASKELL, speaking for the court, in *Clay* v. *Towle*, 78 Maine, 89: "His [the director's] duty required that he should know the financial standing of the corporation, and he is presumed to have performed it. If he has been recreant in guarding the interests intrusted to his care, he cannot be allowed to set up such dereliction of duty to his own profit and advantage over other creditors, who had a right to rely upon his judicious action, and discreet management, for the equal benefit of all interested in the affairs of the corporation."

While this corporation was a going concern, but in fact hopelessly insolvent, as was well known to the directors, Mr. Moses took a conveyance of practically all its available assets, to secure a prior indebtedness of the corporation to himself. Notwithstanding the forms of law were observed in the bill of sale, a formal delivery made, and various entries made in the books of the corporation, the insurance was not changed and all the materials included in the bill of sale remained ostensibly in possession of the corporation and were used, as before, in the operation of the mill, and the product shipped in the name of the company, though billed to the consignee in the name of Moses. The mill was kept running under the same management from the date of the transfer, June 17, 1898, to August 30, 1898, when the assignment was made to the defendants. Meantime the corporation was contracting debts for supplies, and creditors were ignorant of the transfer to Moses and of the financial standing of the corporation.

It is claimed that a present consideration for the transfer may be found in the undertaking of Moses to further furnish funds for the corporation. But he made no further advances, nor in any way agreed to do so, as a part of the transaction or in connection with it. His agreement of June 20 made no reference to the conveyance of the 17th, and evidently was not based upon it. It was an undertaking specially in the interest of Moses and for his benefit, and not for the assumption of additional liability on his part. No consideration for the sale, except prior indebtedness, is shown. The transfer to him was void as against creditors. Whether so intended or not, it was nevertheless a fraud upon them.

*O'Donnell* v. *Steel Co.* 53 Ill. Ap. 314; *Richards* v. *N. H. M. Fire Ins. Co.* 43 N. H. 263; *Haywood* v. *Lincoln Lumber Co.* 64 Wis. 639; *Hopkins' and Johnson's Appeal,* 90 Pa. St. 69; *Baxter Moses,* 77 Maine, 480; *Clay* v. *Towle,* supra; *In Re Brockway Man. Co.* 89 Maine, 121.; *Koehler* v. *Black River Falls Iron Co.* 2 Black, 719; *Howe* v. *Sandford,* 44 Fed. Rep. 231; *Ogden* v. *Murray,* 39 N. Y. 202.

The utmost effect that could be given to the sale to Moses would be to treat it as conveying the title, charged with a trust for all creditors, which a court of equity would enforce. But the better opinion, and one more consistent with the authorities and sound public policy, is that the conveyance to him was void, as against creditors.

Complainants insist that defendants by the assignment took only the interest which the corporation had at that time—and that, if the conveyance to Moses was fraudulent as to creditors, it was valid against the corporation and cannot be avoided by the assignees. It is a sufficient answer to say that, as the proceeds of the property are in the actual possession of the respondents, and as they belong in equity to the creditors of the corporation, and not to the plaintiffs as assignees of Moses, this court will not disturb that possession, but allow defendants to distribute the funds among the creditors of the corporation, who ought to receive them. It will not aid the plaintiffs to obtain the fruits of an illegal contract.

Although it is unnecessary to decide whether assignees under a voluntary assignment can avoid a fraudulent conveyance of their assignor, in favor of creditors, there is great force in the reasoning of Gibson, C. J., in *Englebert* v. *Blanjot,* 2 Whar. 240,—" what then is the interest of a debtor in property fraudulently conveyed by him? As regards benefits to himself, absolutely nothing; but as regards benefits to those attempted to be defrauded, something tangible and substantial. For the benefit of those, the ownership remains in him as a trustee ex maleficio. On no other principle could the legal title be sold even on a judicial process against him, yet it is constantly seized in execution as his and sold as his. The title remains in him so far as is necessary to protect the interest of

his creditors. . . . . If a fraudulent conveyance be void as to creditors, it follows that the title remains in the debtor, as to his creditors, and why may he not convey it for their benefit? It would be a shallow rule that would disable him from yielding to them voluntarily what they might wring from him by process.". *Buehler* v. *Gloninger*, 2 Watts, 226.   In *Pillsbury* v. *Kingon*, 33 N. J. Eq. 287, it is held that an administrator of an insolvent estate, so far represents creditors that he may maintain suit to have a fradulent conveyance of his intestate set aside.   In *Shears* v. *Rogers*, 3 B. & Ad. 363, it is said, "that whenever a man makes a gift of goods which is fraudulent and void as against creditors, and dies, he is considered to have died in full possession, with respect to the claims of creditors, and the goods are assets in the hands of his executor."   It is not perceived why the voluntary assignee should not have the same right.

*Bill dismissed with costs.*