NEWCOMER, et al, Respondents, v. MOUNTAIN SPRINGS ICE & COLD STORAGE COMPANY, et al, Appellants.

(256 N. W. 359.)

(File No. 7622. Opinion filed September 17, 1934.)

*Denu & Philip* and *Williams & Sweet,* all of Rapid City, for Appellants.

*Soule & Sieler* and *Bangs & Rudesill,* all of Rapid City, for Respondents.

RUDOLPH, J. This is an action by three minority stockholders of the Mountain Springs Ice & Cold Storage Company against the corporation and I. J. Gray and Ernest Gray, the majority stockholders of the corporation, who were also owners of the Rapid City Ice Company, a copartnership composed of them-

selves and conducting a wholesale and retail ice business in Rapid City. The complaint alleges that the defendant corporation was incorporated for the purpose of manufacturing and selling artificial ice in Rapid City and vicinity on the 21st day of May, 1921; that 200 shares of capital stock have been issued; that prior to the 31st day of March, 1926, the said company was actually engaged in the manufacturing and sale of ice in Rapid City; that on the 31st day of March, 1926, the defendants, I. J. Gray and Ernest Gray, with the fraudulent and unlawful purpose and design of securing control of business and affairs of the Mountain Springs Ice & Cold Storage Company, and of destroying the good will and business thereof, and of diverting the profits thereof to their own use and benefit, purchased and became the owners and holders of the majority of the said stock of the corporation; that thereafter the said Grays pursued a policy of mulcting the corporation by means of appropriating to themselves as copartners in the Rapid City Ice Company the retail business of the defendant corporation, voting to themselves illegal and excessive salaries and wages, purchasing from the said defendant corporation large amounts of ice at an inadequate and unfair price, and by general mismanagement of the affairs of the said corporation, to its detriment and to the advantage of the said Grays. The plaintiffs prayed for an accounting, and asked that the salaries and wages taken by the Grays from the corporation, and the profits secured by the Grays because of their mismanagement of the said corporation, be restored to the corporation. After issue was joined and a trial was had, the court made findings of fact and conclusions of law in favor of the plaintiffs, and rendered judgment against the defendants I. J. Gray and Ernest Gray, decreeing that the said Grays restore and return to the said corporation the sum of $10,433. This is an appeal from the judgment and an order denying a motion for a new trial.

It is undisputed that, prior to the time the Grays obtained the controlling interest in the defendant corporation, they were conducting an ice business in Rapid City as a copartnership under the name of Rapid City Ice Company. This company had a storage house and delivery equipment which, together with other assets, amounted to about $8,000. The business of the Rapid City Ice Company was in direct competition with the business of the defendant corporation, but it is apparent that the demand for the

artificial ice manufactured by the defendant corporation was overcoming the demand for the natural ice sold by the Rapid City Ice Company. In 1926, owing to an unfavorable season, the Rapid City Ice Company had not been able to put up a supply of ice sufficient to meet its requirements, and the Grays thereupon entered into negotiations which finally resulted in their purchasing a controlling interest in the defendant corporation. Immediately after gaining control of the corporation, Ernest Gray, who is the son of I. J. Gray, was elected secretary-treasurer and general manager of the corporation at a salary of $200 per month. The entire delivery equipment of the defendant corporation was leased to the Rapid City Ice Company for $100 per year, and a contract was entered into between the defendant corporation and the Rapid City Ice Company for the sale of ice by the corporation to the Rapid City Ice Company at $5 per ton. At the first directors' meeting at which Ernest was named as secretary-treasurer and general manager at a salary of $200 per month, there were present only one Hesse, from whom the Grays had purchased all of their stock, and one Heald, who owned one share of stock in the corporation and was the engineer for the corporation, employed at $150 per month. It is maintained by appellants that Hesse retained one share of stock that he might act as a director at this meeting. The board of directors consisted of three members, and thereafter and at all times the defendants I. J. Gray and Ernest Gray, through their control of majority stock of said corporation, caused themselves to be elected as directors. During all of the time after the Grays obtained the controlling interest in said corporation, either one or both of the said Grays were named as officers of the corporation and withdrew from the corporation salaries voted them by the board of directors. In 1926 Ernest, as general manager, drew a salary of $1,800; in 1927, I. J. Gray, as manager, drew a salary of $2,400; in 1928 Ernest, as secretary, and I. J., as manager, drew salaries totalling $3,600; in 1929 Ernest, as secretary and I. J., as manager, drew salaries in the amount of $3,600; in 1930 Ernest, as secretary, and I. J., as manager, drew salaries in the amount of $5,100; in 1931 Ernest, as secretary for two months, and I. J., as manager for five month, drew salaries in the amount of $1,600—making a total withdrawal as salaries by the Grays in the amount of $18,100.

The trial court found, and after a careful consideration of the record we are convinced that the findings of the trial court are fully sustained by the evidence, that the sale of ice to the Rapid City Ice Company at the price of $5 per ton f. o. b. platform was in disregard of the interests of the defendant corporation, and that the discontinuance of the retail ice business by the corporation was improvident and was to the interest of the Rapid City Ice Company and not to the interest of the corporation. The trial court further found other facts, wherein the Grays had conducted the business of the corporation adversely to the corporation and in the interest of the Grays. However, we believe it unnecessary to detail these findings. Sufficient to say is that we are convinced that they are supported by the evidence introduced. The trial court further found, as follows:

"VIII. That with the purpose and design and effect of dominating the affairs, policies and business of said corporation, and diverting to themselves or their co-partnership, the profits and product of said corporation, the said defendants, by virtue of their majority stock holdings in said corporation, forthwith caused themselves to be elected upon the Board of Directors and to be perpetuated in control of said directory, and caused the said I. J. Gray to be elected president and general manager of said corporation, and the said Ernest Gray to be elected secretary and treasurer thereof, and caused the said officers to be endowed with salaries wholly disproportionate to the value of the services rendered by such officers to the said corporation. That the election of each of said defendants to the respective offices aforesaid and the voting of the salary to each of said defendants in each successive year was accomplished by the votes of said defendants themselves as directors of said corporation, and/or was accomplished by virtue of the dominating influence and stock control of the defendants by themselves or through their representatives and agents. That the salaries so voted to the defendants were received and paid to them from the treasury of the said corporation and the amount thereof up to the 9th day of June, 1931, the date of the trial of this cause, was as follows, to-wit: To the said Ernest Gray the sum of $7,233.00 and to the said I. J. Gray the sum of $11,533.00, making the total sum of $18,766.00 diverted by the defendants from the treasury of said corporation. And the Court finds that during all

of the time the defendants were so acting as officers of said corporation and voting for themselves and receiving salaries as such officers, they were the sole owners as equal partners under the name of the Rapid City Ice Company, of a rival and competitive concern, engaged in the cutting, harvesting and distribution of natural ice and the purchase, sale and distribution of artificial ice in the same territory and locality wherein the defendant corporation was in business; that they were at all times in active charge and control of the business, affairs and policies of both concerns; that as officers of the defendant corporation, and as majority stockholders therein, they occupied a position of trust and confidence toward the minority stockholders which devolved upon them an obligation of good faith in their dealings with said corporation, and their interest in the said co-partnership and its business was in direct conflict therewith. And the Court finds that in their domination and conduct of the affairs of the said corporation they permitted themselves to be influenced and controlled by their adverse and conflicting interest in the said co-partnership rather than by their official duty of good faith towards the said corporation."

"XIV. The Court finds that the services of the defendant, Ernest Gray, rendered to said corporation, and for which he received the sum of $7,233.00, were of the reasonable value of $1,800.00 only, and that any seeming or apparent additional services by him rendered were more than offset by detriment caused to the corporation by his wrongful conduct and by subservience of his trust in the matter of the affairs of said corporation."

"XV. The Court finds that the reasonable value of the services rendered by the defendant, I. J. Gray, to said corporation, for which he was paid $11,533.00, was and is the sum of $6,533.00, and that any seeming or apparent additional services by him rendered were more than offset by detriment caused to the corporation by his wrongful conduct and by subservience of his trust in the matter of the affairs of said corporation."

▆▆ In Koehler v. Black River Falls Iron Co., 2 Black, 715, 720, 17 L. Ed. 339, the Supreme Court of the United States, in discussing the question as to the position of directors of a corporation, uses the following language: "Directors cannot thus deal with the important interests entrusted to their management. They

hold a place of trust, and by accepting the trust are obliged to execute it with fidelity, not for their own benefit, but for the common benefit of the stockholders of the corporation."

The rule stated in the above quotation is without dispute, and we are convinced, after a careful reading of this record, that the two Grays who, by virtue of their majority stockholdings in the corporation, caused themselves to constitute a majority of the board of directors, jointly and designedly violated the rule thus announced. The trial court in its final analysis, however, bottomed its judgment upon the theory that the wages and salaries withdrawn from the corporation by the Grays were illegal, and allowed to the Grays a salary which the court found to be the reasonable value of their services, offsetting any seeming or apparent additional services with the detriment caused to the corporation by other wrongful acts by defendants, which detriment the court found to exceed the value of any such seeming or apparent service.

We are of the opinion that the position taken by the trial court is not in any event, in view of its findings, prejudicial to these appellants. Under the rule established in this state, we are satisfied that the resolutions by which the salaries were voted to the Grays were absolutely void. This court in the case of Crocker v. Cumberland Mining & Milling Company, 31 S. D. 137, 139 N. W. 783, 785, established the rule as follows: " * * * When a resolution is passed in which one of the directors is interested, if it is passed by the vote of such director, or by the vote of any other director who is under his controlling influence, without which vote or votes there would not have been a majority in favor of said resolution, or if, without the presence of such interested director and such directors as may be under his influence and control, there would not have been left a quorum of the board of directors, then, in either of such cases, such resolution would be absolutely void as against the corporation."

It seems apparent under the above rule that, during the time that Heald was acting as a director, he was acting under the influence and control of the Grays. Heald admittedly owned his one share of stock that he might qualify to act as a director of the corporation; at the same time he was dependent upon the Grays for his position as engineer and his salary of $150 per month,

which he received from the corporation. The record discloses that Ernest and I. J. Gray were at all times members of the board of directors except at the first meeting, which was attended only by Hesse, from whom the Grays had purchased their stock, and Heald, the engineer; that both Hesse and Heald were under the influence and control of the Grays at this meeting there cannot be any doubt. Hesse no longer had any interest in the corporation, and it is apparent that he was there to represent and act for the Grays. Within the rule announced in the case of Crocker v. Mining & Milling Company, supra, both Heald and Hesse were nothing more than "dummy" directors, acting under the controlling influence of the Grays. After this first meeting, there was never a time but that both Ernest and I. J. Gray constituted a majority of the board of directors, and we are convinced from a reading of this record that, when Ernest, as a member of the board of directors, voted in favor of the salary of his father, I. J.. Gray, he was representing I. J. Gray adversely to the interests of the corporation within the meaning of the Crocker Case; and conversely, when I. J. Gray voted in favor of the salary of Ernest Gray, he was representing Ernest Gray adversely to the interests of the corporation. These two men were copartners operating a concern in direct competition with the defendant corporation. The record is replete with instances wherein these men used the corporation for the benefit of the copartnership, and in this connection it is interesting to note that, during their administration of the corporation, the corporation showed a net loss of something over $1,000, while the copartnership showed a profit of over $20,000. Under these circumstances, should this court say that, when Ernest Gray voted in favor of the salary of I. J. Gray, he was not acting for the benefit of I. J. Gray and adversely to the interests of the corporation within the meaning of the Crocker Case, it would simply close its eyes and fail to observe the patent and very apparent facts disclosed by this record and findings of the court.

In view of the above, and under the rule announced in the Crocker Case, the resolutions voting the salaries to Ernest and I. J. Gray were absolutely void; however, the court allowed the Grays what it found to be a reasonable salary for the services performed. Whether this allowance was based upon a sufficient pleading we do not decide. There is no cross-appeal by respondent, and

we are satisfied, in view of the entire record, that the court was liberal in allowing to the Grays the amount that it did allow, considering the other acts of the Grays, which the court found to be in bad faith and adverse to the interest of the corporation.

The trial court found that the Grays had withdrawn from the corporation, by way of salaries, the sum of $18,766; respondents in their brief concede that the total withdrawn by the Grays, by way of salaries, amounted to $18,100, making a difference of $666. In view of the fact that the judgment of the trial court is bottomed upon the amount of the salaries withdrawn from the corporation by the Grays, we believe the judgment must be reduced to the extent of $666.

The trial court is therefore instructed to modify its judgment by reducing it $666, and, as thus modified, the judgment is affirmed. Respondents may tax costs.

ROBERTS, P. J., and CAMPBELL, and WARREN, JJ., concur.

POLLEY, J. (dissenting). It appears from the record in this case that at and for many years prior to the month of May, 1921, the defendants, I. J. Gray and Ernest Gray, constituting a copartnership, had been engaged in the ice business in Rapid City under the name of Rapid City Ice Company. During the said month of May 1921, the plaintiffs, Newcomer, Miller, Weaver, and one W. F. Hesse decided to go into the ice business in competition with the said Rapid City Ice Company. Pursuant to this plan, they organized a corporation known as Mountain Springs Ice & Cold Storage Corporation. Their capital stock consisted of 500 shares, of the part value of $100 per share, and had a board of three directors. Two hundred shares of this stock was issued as follows: A. R. Weaver 42 shares; John D. Newcomer, 21 shares; O. L. Miller, 20 shares; W. F. Hesse, 116 shares; and J. H. Heald, one share. They constructed a plant and installed artificial ice-making machinery with a capacity of some thirteen or fourteen tons of ice per day. Other necessary equipment was acquired, and the company proceeded to manufacture ice and sell the same to the ice users in Rapid City. Hesse was elected general manager of the plant, and was allowed a salary of $200 per month. They continued this business until some time during the month of March, 1926. By this

time the venture, so far as any profit from the business is concerned, had proven to be a complete failure. The company not only had never paid a cent in dividends to any of the stockholders, but had continually run behind until the month of March, 1926, when it was in debt comething like $11,000, a sum considerably in excess of the value of its entire ice plant.

During the time the Rapid City Ice Company had been in business it owned a body of water near the city of Rapid City where natural ice formed during the wintertime. They had an icehouse with a storage capacity of some 1,600 tons of ice. This icehouse they usually filled with ice during the winter months and peddled it out to their customers during the remainder of the year. The winter and spring of 1926 was a poor season for the formation of natural ice, and the ice company was unable to cut and store a sufficient amount of ice to supply its trade for the coming season. They could buy artificial ice in Deadwood for $5 per ton, but preferred to use ice manufactured in Rapid City. In order to provide ice in Rapid City, they purchased the 116 shares of stock in the Mountain Springs Ice Company then owned by W. F. Hesse. This gave the Grays a majority of the outstanding stock and necessarily control of said corporation. Immediately thereafter a stockholders' meeting was held in which one of the Grays was elected a director of the company. The board of directors then became I. J. Gray, W. F. Hesse, and A. R. Weaver. Ernest Gray was elected to take the place of Hesse as manager at the same salary of $200 per month that Hesse had theretofore been receiving. Hesse then resigned as a director, and Ernest Gray was elected to take his place on the board of directors. As the Grays took charge of the management of the corporation, they discontinued the retail business of ice that had been carried on by the Mountain Springs Ice Company and turned the corporation's retail business over to the copartnership. They then purchased the entire output of the corporation's ice plant at wholesale, and sold the same to their customers in Rapid City and vicinity. This policy was continued for a period of approximately five years and until the trial of this action. The ice plant of the corporation had been operated continuously to its full capacity. The partnership allowed the corporation $5 per ton for its entire output delivered at the plant. The result was that during the time this policy was fol-

4—63 S. D.

lowed the corporation not only paid all of its running expenses, including manager and secretary's salaries, and repairs, but had a sufficient surplus to pay, and did pay, all of the indebtedness against the corporation at the time the Grays took over the control of the corporation, so that at the time of the trial the corporation was entirely out of debt with all taxes paid. The plant had been kept in repair, so that at the time of the trial it was in as good condition as it was when first installed.

At the end of the first year after the Grays acquired their interest in the corporation, I. J. Gray was elected general manager in place of Ernest Gray, and Ernest Gray was elected secretary and treasurer. In general, this plan was continued until the time of the trial. At the time of the trial, the records showed that Ernest Gray had drawn a total amount of $7,233 as salary, and I. J. Gray had drawn $11,533, making a total sum of $18,766. There was evidence, undisputed, to the effect that both of these parties earned the salaries so paid to them, and that the services they had rendered to the company were of the reasonable value of the amount so paid to them. The trial court, however, was of the opinion that this was too much money for the services they had rendered, and entered a decree to the effect that the sum of $7,233 that had been paid to Ernest Gray should be reduced to the sum of $1,800, which was decreed to have been the full value of all the services he had rendered. There is no evidence in the record to support this finding. The court also found that the $11,533 that had been paid to I. J. Gray was too much money for the services he had rendered, and decreed that said sum should be reduced to $6,533, though there was no evidence in the record to sustain any such finding, and that the difference between these two sums, amounting to $10,433, and the amount they had received, should be returned to the corporation, and entered a joint and several judgment against the defendants for this amount; that is, the property of either one of these defendants may be applied in payment of the judgment against the other. In arriving at this conclusion the court substituted its own notion of what was a proper remuneration for these two defendants for the services they had rendered for the positive and undisputed testimony that was taken at the trial.

In plaintiff's complaint, the defendants are charged with all the shortcomings and misconduct it is possible for majority stockholders to commit in the operation of a corporation, but the court, in arriving at its judgment, considered only the excess salaries that had been paid to the defendants, and expressly found that: "In the management of the business of said corporation, however, the said defendants have at no time been guilty of any wilful waste of the property of said corporation, and have not been guilty of any misappropriation or embezzlement of funds, but have rendered a full and accurate account of all moneys received by them for and on behalf of said corporation."

In findings of fact Nos. 14 and 15 the court found:

No. 14: " * * * That the services of the defendant, Ernest Gray, rendered to said corporation, and for which he received the sum of $7233, were of the reasonable value of $1800.00 only, and that any seeming or apparent additional services by him rendered were more than offset by detriment caused to the corporation by his wrongful conduct and by subservience of his trust in the matter of the affairs of said corporation."

No. 15: "The court finds that the reasonable value of the services rendered by the defendant, I. J. Gray, to said corporation, for which he was paid $11,533.00 was and is the sum of $6533, and that any seeming or apparent additional services by him rendered were more than offset by detriment caused to the corporation by his wrongful conduct and by subservience of his trust in the matter of the affairs of said corporation."

The evidence shows that both of these defendants devoted all of their time to the interests of the corporation; that they made a market for the entire output of the ice plant running at full capacity, and that during the five years that they were in control of the management of the corporation they not only paid all the running expenses of the plant, paid for all repairs, and kept it in first-class condition all of the time, but paid all of the taxes, and paid all of the $11,000 of indebtedness that had existed against the corporation when they took charge of its affairs, and there is no evidence in the record that shows, or purports to show, any detriment caused to the corporation by either of the defendants.

It is claimed by the plaintiffs, and assumed by the court, that in all cases where either of the Grays was elected general manager

or secretary-treasurer he was so elected by his own vote. This is not true. An examination of the evidence will show that in all cases where either of them was elected to one of those offices he was elected by the vote of a majority of the board of directors without counting his own vote. During the years 1928, 1929, 1930, and 1931, one or the other of the plaintiffs was a member of the board of directors, and was present in each case when defendants were elected, but in no case did such director vote against such election.

After the commencement of the action, and prior to the time of the trial, a so-called audit was made of the accounts of the corporation by an expert accountant. This so-called audit was in fact no audit at all, but a mere juggling of figures to show a desired result. For instance, the audit showed a loss of a dollar per ton on each ton of artificial ice that was sold for $5, yet it is admitted that artificial ice could be bought in wholesale lots at Deadwood and Pluma at $5 per ton. It is not claimed that it cost any more to manufacture ice in Rapid City than in Pluma, and the record shows that a profit was realized during the management of the Grays sufficient to pay the indebtedness of approximately $11,000 that existed when the Grays took over the management of the corporation. Again this accountant charged off for depreciation, for the year 1926, $2,748; for 1927, $2,748.17; for 1928, $2,748.17; for 1929, $2,734.59; and for seven months of 1930, $1,505.16—a total sum of $12,484.26, and more than the total value of the entire plant.

The audit shows that there had actually been spent for repairs for 1926, $692.93; for 1927, $149.64; for 1928, $818.84; for 1929, $381.40; and for seven months in 1930, $182.37—or a total of $2,225.18; that this sum took care of all of the depreciation; that the plant was in first-class condition, with all depreciation fully paid for; and that the above arbitrary depreciation of $12,484.26 was wholly nonexistent, and was, in fact, a profit that was used to pay off the indebtedness that existed when the Grays took over the management of the corporation.

The plaintiffs failed wholly to establish the allegations of their complaint. The judgment ought to be reversed and the cause ought to be remanded to the trial court, with directions to dismiss the action at plaintiffs' cost.