## WESTWOOD v. CONTINENTAL CAN CO., Inc.

### No. 7603.

Circuit Court of Appeals, Fifth Circuit.

Dec. 10, 1935.

John W. Beveridge and T. S. Taliaferro, both of Houston, Tex., for appellant.

J. C. Hutcheson, III., and John P. Bullington, both of Houston, Tex., for appellee.

Before FOSTER and SIBLEY, Circuit Judges, and STRUM, District Judge.

SIBLEY, Circuit Judge.

The appellant H. O. Westwood was a stockholder, director, vice president and the general manager of Southwestern Can Co., Inc. He sued appellee Continental Can Co., Inc., for breach of a contract which looked to a sale of all the assets of the first-named company to the second, out of which Westwood would have realized a profit. After hearing plaintiff's evidence, the District Judge directed a verdict against him on the grounds that no certain contract had been proven; and if it had been, the contract was so contrary to the duty which Westwood owed his corporation and its shareholders as to afford him no cause of action on it. It was also pleaded and is now urged that the contract, if any, was in part for the sale of lands, and there was no writing sufficient under the Texas Statute of Frauds. Error is assigned on the direction of the verdict and on the refusal to grant a new trial because of newly discovered evidence.

The evidence showed that the two companies were competitors, and that the Southwestern was losing business and money. No dividend was paid in 1931 There were 3,000 preferred shares of a par of $100 each, and 9,000 shares no-par common stock which had the controlling vote. During 1931 the Continental offered $380,000 for the assets of the Southwestern, but as nearly the whole price would go to the preferred stockholders for principal and accumulated dividends the common stockholders refused to sell. On March 2, 1932, the president of Continental, by telephone, offered to Westwood to pay $360,000 for the assets based on December 31, 1931, statement, less losses since. Westwood stated he was not authorized to sell, but proposed to get options on 80 per cent. of the stock to be deposited in escrow in a bank by May 20, whereupon the Continental should furnish the money to pay for the optioned stock; Westwood should then use his stock control to liq-

uidate the corporation and sell the assets to Continental. They thought the Continental could not itself buy the stock without violating the federal and Texas anti-trust laws. No certain binding contract appears in the telephone conversation. On the same day Westwood was directed by telegram to confer with a firm of lawyers who represented Continental in Houston. The next day Continental's president telegraphed Westwood: "If you are assured of having control of sufficient amount of stock to carry out transaction along legal lines our attorneys may require, our Mr. Hartlieb can be in Houston Monday empowered with full authority." Westwood replied that he had assurance of getting well over 80 per cent. of both preferred and common stock, but suggested that before Hartlieb came accountants should go over adjustments of December statement: "This to determine if total amount required for purchase of stock will place me in position to sell assets at price offered and cover adjustments." On March 4, Continental's president telegraphed: "Have wired our attorneys concerning form of offer. Please see them." The same day the attorneys wrote: "Mr. Hartlieb has wired us that if it will assist you in lining up your situation and if the legal details can be satisfactorily worked out, he is prepared to make an offer of $354,000 for the assets if they are substantially in accordance with Dec. 31, 1931, figures." The reduction of $6,000 was because of architect's fees of that amount for plans of a new building, which were of no value to Continental. On March 5, Westwood wrote Continental acknowledging preceding telegrams and concluding: "See no reason at this time why this deal cannot be concluded without any great difficulty and will communicate with you directly I have come to a full understanding with your representatives." On March 10, Continental's president acknowledged the letter and said: "As we understand it you and they (the attorneys) are working out some plan of procedure. When the matter reaches that stage where it is desirable to have Mr. Hartlieb visit Houston he will arrange to do so." These are all the writings. Mr. Hartlieb was, so far as appears, never sent for and never came to make any formal agreement. The attorneys prepared for Westwood a form of option and a letter of explanation

which were mailed out by him with a copy of the December statement to each stockholder. In the letter Westwood offered $80 per share for preferred and $10 per share for common stock if within 30 days he could obtain all or practically all the stock. By April 26 options for all the stock were in the bank and the attorneys were so notified and the money requested to take up the options. The accountants, however, claimed a loss since December 31 of $29,000 instead of the $19,000 which Westwood admitted, and finally that $50,000 should be deducted for obsolete machinery. These deductions would not have left enough to pay for the stock, and Westwood refused to allow them. The attorneys on May 16 wrote that Mr. Hartlieb had telegraphed: "Please notify Mr. Westwood inasmuch as total net assets after checking on our part show very substantial reductions from those represented by balance sheet December, 1931, we are not inclined to reopen the matter." Westwood claims that had he been furnished the money to take up the options and been allowed to sell out the assets at $354,000 less the true loss since December 31, 1931, he would have made a profit of some $28,000.

Giving due weight to the written communications, it cannot be reasonably concluded that any exact meeting of minds ever occurred. Continental was expecting Mr. Hartlieb to contract in its behalf. He spoke only through the attorneys and went no further than to offer $354,000 for the assets if legal details could be worked out and if the assets proved substantially as in the statement. No agreement on details was ever reached with him. Westwood declined to meet Hartlieb until the accounting had been made; and the result of the accounting was to wreck the negotiation. Certainly the writings do not spell out any contract such as is sued on. The evidence shows that real estate valued at over $20,000, though wholly undescribed, was among the assets. Both the writings and the testimony of Westwood show clearly that he was not the agent of Continental to buy up the stock, but that Continental was negotiating to buy the assets when Westwood should get himself into a position to sell them. Both parties supposed that Continental could not lawfully buy the stock. Although Westwood got in position to buy the stock and thus to sell the assets to Continental, there

was no contract in writing binding Continental to buy. The Texas statute, article 3995, Revised Civil Statutes 1925, requires a writing to make actionable a contract for a sale or purchase of land; and since for a single consideration both land and personalty are alleged to have been sold, because of the presence of the land the whole contract fails for want of a sufficient writing. Cantrell v. Brannon (Tex.Civ.App.) 16 S.W.(2d) 400; Quirk v. Bank of Commerce & Trust Co. (C.C.A.) 244 F. 682; Traiman v. Rappaport (C.C.A.) 41 F.(2d) 336, 71 A.L.R. 475. That Westwood did not own the property, but was to acquire and sell it would not alter the case. Dunphy v. Ryan, 116 U.S. 491, 6 S.Ct. 486, 29 L.Ed. 703.

The point raised by the judge, that the contract claimed if sufficiently proven is contrary to public policy because for a breach of duty by Westwood to his corporation and its stockholders is also well taken. That the objection was not pleaded raises no difficulty because it is allowed, not for the benefit of the defendant, but for the public good, and because the law will not enforce a contract which it condemns. The court may properly refuse to act even though the parties attempt to waive the question. Oscanyan v. Winchester Repeating Arms Co., 103 U.S. 261, 26 L.Ed. 539. In the cited case is a review of the decisions which relate to contracts calculated to seduce a public official from his duty, and it is pointed out that the vice of them lies not in that duty was in fact betrayed or improper acts done, but in the tendency to induce unfaithfulness. The law closes the door to temptation by refusing any recognition of contracts having that tendency. Similarly against public policy are contracts whose object or tendency is to cause a breach of duty on the part of persons in a fiduciary or confidential relation, as agents and employees, attorneys, trustees, executors, and the like. 13 C.J. Contracts, §§ 348, 349, and cases cited. The principle was asserted in Woodstock Iron Co. v. Richmond & Danville Extension Co., 129 U.S. 643, 9 S.Ct. 402, 32 L.Ed. 819, though the case was rested also on the public nature of a railroad. In Ramspeck v. Pattillo, 104 Ga. 772, 30 S.E. 962, 42 L.R.A. 197, 69 Am.St.Rep. 197, the contract of an individual who was a fire insurance agent to keep plaintiff's property insured in the agent's company was held to be at war with the agent's duty to judge of the risk offered, and unenforceable. So in Sessions v. Payne, 113 Ga. 955, 39 S.E. 325, an agent to collect a mortgage debt who without his principal's consent made an agreement with an attorney to share the latter's fees for handling the case was refused recovery. It cannot be denied that the director and general manager of a corporation is on his election by the stockholders constituted in a broad sense their agent to conduct the corporate business according to the charter. He is in the language of equity a quasi trustee, though not technically the holder of a title in trust. Whether in purchasing shares of stock for himself he is bound by all the duties of full disclosure that would apply to an agent or a trustee in purchasing the subject-matter of the agency or trust has been much debated. A negative answer was given in Board of Com'rs of Tippecanoe County v. Reynolds, 44 Ind. 509, 15 Am.Rep. 245, and in many cases since. Justice Lamar when on the Supreme Court of Georgia forcefully gave an affirmative answer for that court in Oliver v. Oliver, 118 Ga. 362, 45 S.E. 232.[1] Expressions in Jackson v. Ludeling, 21 Wall. 616, 22 L.Ed. 492, and Koehler v. Black River Falls Iron Co., 2 Black, 715, 17 L.Ed. 339, go far to support it. But in Strong v. Repide, 213 U.S. 419, 29 S.Ct. 521, 53 L.Ed. 853, which arose under Spanish law, but which the court thought like the English law, it was assumed that a director may ordinarily acquire stock in his corporation without disclosing information gotten as director if he makes no misrepresentation, but it was held that special circumstances may require full disclosure, and Oliver v. Oliver was cited as a case of special circumstances. Since Repide was a director and general administrator of the company and was conducting and best knew the state of a negotiation with the government to sell to it the company's lands which were its chief assets, he was not allowed to keep shares which he had bought up below their worth if such sale were consum-

---

[1] Cases pro and con are collected in footnotes in Dunnett v. Arn (C.C.A.) 71 F.(2d) 912, 917, 918.

mated, because he had not disclosed the fact that the sale was about to take place and had acted through another probably to escape questions. Oliver v. Oliver was very like the present case in that options were taken by the managing officer with a view to selling out the corporate assets, no information being given of the sale which had been arranged. In Jackson v. Ludeling, the corporate assets were sold through a dominated sheriff's sale to the detriment of bondholders, to whom the benefiting directors were held to owe a duty. In other cases where stock was acquired by officers, not in order to share more largely in the normal operations of the corporation, but with a purpose of disposing of its assets, it has been thought that there was in effect a corporate transaction in which the officers were agents and trustees and not merely individuals purchasing stock, and hence that they owed special duties to the shareholders. Commonwealth Title Ins. & Trust Co. v. Seltzer, 227 Pa. 410, 76 A. 77, 136 Am.St.Rep. 896; Dunnett v. Arn (C.C.A.) 71 F.(2d) 912. Contracts by officers to secure control of their corporations by stock purchases have been several times held contrary to official duty and unenforceable. Carlisle v. Smith (D.C.) 234 F. 759; Horbach v. Coyle (C.C.A.) 2 F.(2d) 702; Kratzer v. Day (C.C.A.) 12 F.(2d) 724. We are satisfied that when directors or other officers step aside from the duty of managing the corporate business under the charter for the benefit of stockholders, and enter upon schemes among themselves or with others to dispose of the corporate business and to reap a personal profit at the expense of the stockholders by buying up their shares without full disclosure and at an inadequate price, there is a breach of duty. If the corporation ought to cease business, the stockholders may so decide and take steps to share the assets. If a favorable opportunity arises to sell out, the stockholders and not the managing officers are entitled to have the benefit of it. If an agreement cannot be reached by the stockholders, no doubt one faction may buy out the other. Westwood, a stockholder, though also the general manager, could, in the situation that had developed, on full disclosure properly offer to buy up the stock. The letter he wrote to each stockholder set forth the state of the business, the want of harmony among the stockholders, and the wisdom of acting promptly to save the investment. In making his offer for the stock, he stated that he proposed to resell it as an entirety, and if unable to do so, to dissolve the corporation and dispose of the assets, hoping to make a profit as the reward of his risk and efforts. He referred them to the books for information about the business and said he was making no representations about the value of the stock. Had he stopped there all would probably have been well, but the attorneys who were arranging details for Continental put in the letter with Westwood's acquiescence the words: "For your information I am now carrying on negotiations for the sale of the stock or of the assets of the corporation. I have not however received a binding offer from any purchaser and no terms or conditions of any such sale have been definitely agreed upon." If the last statement were true, as in the first part of this opinion we have held, the case falls for want of a contract. If, as Westwood now claims, it was not true, then there was not only a failure to disclose an advantageous sale already arranged which made at least the preferred stock worth substantially more than was offered, but there was direct misrepresentation. The making of this misrepresentation was not collateral to the contract, but was participated in by Continental as a part of the plan to secure the assets. Whether Westwood was purchasing the stock for himself so as to sell the assets as indicated by the writings and by some of his own testimony, or was acting as the agent of Continental as his pleadings contend, the plan as a whole was thus one for the managing officer to deceive the stockholders and acquire the corporate assets for his own and another's profit. The maxim applies, Ex turpi causa non oritur actio.

The newly discovered evidence consisted of affidavits of three stockholders that they knew when they signed options that Westwood had an offer of about $360,000 for the assets, and they wished the sale of the stock to stand. The showing for a new trial is defective in that there is neither allegation nor evidence that Westwood himself did not know of the evidence at the time of the trial. It does not appear to relate to all the stockholders. And, finally, to show

that the misrepresentation did not in fact deceive would not cure the original vice of the contract sued upon that it looked to a breach of duty by the managing director and was contrary to sound policy. The new evidence of course would not help to show a complete contract, and one valid as against the statute of frauds, and it would in no view likely produce a different result. There was no abuse of discretion in overruling the motion.

Judgment affirmed.