**POLARIS IRON CO. v. TRIPPETT et al.**
**No. 675.**

District Court, W. D. Louisiana, Shreveport Division.

July 15, 1939.

Foster, Hall, Barret & Smith, of Shreveport, La., for complainant.

W. H. Sanford, of Dallas, Tex., and Wilkinson, Lewis & Wilkinson, of Shreveport, La., for Meadows.

Foster, Hall, Barret & Smith and E. S. Klein, all of Shreveport, La., for intervenors.

DAWKINS, District Judge.

Plaintiff sold to defendants 188½ shares of stock in an oil company, The Texota Oil Corporation, for the sum of $36,192, and brought this suit for an accounting on behalf of itself and such other stockholders as might join herein, charging the defendants, R. G. Trippett and A. H. Meadows immediately after the transfer of the stock, sold the assets of the corporation for a price which netted them a profit up-on plaintiff's stock of $5,278. It was alleged that the defendants were claiming to be officers and directors of the said corporation and were actually in the physical control of all of its properties to the exclusion of plaintiff and other stockholders, and knew that the price realized was to be paid for the assets of the corporation at the time of the stock purchase, but fraudulently concealed and misrepresented the facts to plaintiff and other stockholders until they had parted with their said stock. Some five individual stockholders, who had also sold to Trippett and Meadows 262⅟₁₂ shares of the stock at the same price, intervened and joined plaintiff in its demand for an accounting and alleged that they had been defrauded of the sum of $7,338.-34.

Defendants denied that the price of the property had been agreed upon before they acquired the stock and otherwise disputed the legal contention of plaintiff.

I find the facts as follows:

The Texota Oil Corporation was organized under the laws of Texas, in 1931, with a capital of 750 shares, divided into equal amounts of Class A and Class B shares. Class A was given the right of electing one member of the board of three directors, while Class B was empowered to elect two. Class A stock was issued to plaintiff and its associates, hereinafter called the Minnesota group, and Class B stock was issued to Messrs. Wilson, Sundby and Grinninger, hereafter called the Texas group. The first board of directors was composed of Wilson and Sundby of the Texas group and Swan of the Minnesota group. A lease upon eleven acres of land in the East Texas oil field, known as the Molly Fen lease, was purchased and three producing wells were drilled thereon.

At a stockholders' meeting, held March 5, 1934, an attempt was made to amend the charter to give all stock equal voice in the election of directors. Slightly less than 75% of all stock voted in favor of the amendment, while slightly more than 25% was cast against it. The annual meeting of stockholders took place on May 15th following, and in the meantime the defendants Trippett and Meadows had acquired from Wilson and Sundby 187⅔ shares of the Class B stock, or a fraction of a share in excess of one-half of that class, which had the right to elect two directors. At the annual meeting it was insisted by those stockholders other than

Trippett and Meadows, that an amendment of the charter had been effected, giving all stock equal voice in selecting directors, and all, or practically all of the Class A stock, as well as those holding Class B stock, other than Trippett and Meadows; voted for the election of Grinninger, Congdon and Garver of the Minnesota group. On the same day, acting under the original charter, a slight majority of the holders of Class B stock elected as directors Trippett and Meadows, who were in the actual physical possession of the assets of the corporation.

The directors elected by the stockholders under the contention that the charter had been amended to give all equal participation, authorized and there was brought a suit in the State court of Texas, against Trippett and Meadows for possession of the company's property. This suit was dismissed by the District Court for want of capacity in the attorneys representing the corporation to bring it, and an appeal was perfected to the Court of Civil Appeals having jurisdiction. Trippett and Meadows continued in charge of the property and the affairs of the company in the meantime. Another suit was next instituted by individuals among the Minnesota group, seeking a receiver for the Texota Corporation. On October 30, 1934, the trial court appointed a receiver but an appeal with supersedeas was perfected and the receiver never took charge of the property, thus again leaving Trippett and Meadows in control as President and Secretary, respectively, of the corporation.

On December 1, 1934, a permit for the drilling of a fourth well upon the lease was obtained from the Railroad Commission of Texas.

S. A. Cochran, a lease broker, who had represented Trippett and Meadows in a large number of transactions in the East Texas field, was given a letter by Trippett to the effect that he would consider selling the eleven acre lease of the Texota Oil Corporation for $200,000. Cochran got in touch with D. W. Josey, Vice-President of the Rancho Oil Company about December 5, 1934, and discussed the figure of $200,000 but was informed the price was too high. On December 10th Cochran again called Josey on the telephone to know "if he had come to any decision", and either at that time or shortly after, Josey told Cochran that "he would be interested in the property if it could be bought for $175,000, with four wells completed on it". Cochran was not sure as to the date of the conversation. He said "there were several conversations. * * * One of them might have been on the 15th." To the best of his recollection, Cochran communicated this offer to Trippett "about a week" before the sale was consummated on the 13th of that month. Josey testified likewise to the conversation of Cochran on December 5th, at which the letter from Trippett was shown, stating that the price of $200,000 would be considered. "The next time I saw him he called me a few days after that and wanted me to make an offer on it and I made him an offer of $175,000 for the" eleven acres with four wells on it. "That was, or I guess it was, a week before the trade was made. * * * I imagine about the 15th or 16th, somewhere around there". Since the two witnesses who knew the facts are substantially in accord, I conclude and find that this offer was made as early as December 15th. Further negotiations resulted in the Rancho Oil Company agreeing to pay $180,000 for the property with four producing wells on it but was finally closed by the contract signed on December 20, 1934. Trippett and Meadows received $165,000 net, and $15,000 was paid to Cochran for drilling the fourth well and as commission for negotiating the sale. In the meantime, on December 17, 1934, Trippett and Meadows sent a telegram to Congdon and Garver of the Minnesota group, reading as follows: "On September 18th you made us an offer to sell all your Texota stock including Grinningers for one hundred eighty dollars per share plus distribution estimated at twelve dollars per share in treasury of Texota Corporation and you agreed to accept one fourth thirty days and balance in twelve monthly payments Stop We considered this price too much and we did not need the connections Stop We now need the connections and offer you and other stockholders one hundred sixty dollars per share all cash plus prorata distribution of all funds in treasury of company amounting to approximately twenty dollars per share Stop This offer is on the basis of forty thousand dollars per well plus cash distribution of all accumulated funds which will give the stockholders one hundred eighty dollars per share in cash Stop This offer is all the property is worth and is twenty five hundred dollars per well more than three wells sold for last week in the same

area the price on said wells being thirty seven thousand five hundred dollars per well Stop We are willing to pay this price because we need the connections and since you have heretofore indicated your unwillingness for us to have the connections we are giving you this opportunity to sell us your stock at a fair price so as to avoid further friction when we connect to the wells Stop Please wire us your decision. R. G. Trippett and A. H. Meadows."

On December 19, 1934, Congdon and Garver replied to the message just quoted, by telegram, as follows: "Answering wire seventeenth Inasmuch as price of one hundred eighty dollars per share plus estimated twelve dollar distribution prior to sale was offered by you September seventeenth when you did not need connections we think that now that you do need them you should be willing to pay one hundred ninety-two dollars Stop Fact that there have been no distributions since and estimated cash available for distribution is now twenty five dollars together with improved outlook offset change in terms of payment Stop Therefore Polaris Chaffee Elliott and Grinninger have authorized us offer· you their stock aggregating five hundred four three and one third shares at one hundred ninety two dollars per share cash less any distribution received Stop This is for immediate acceptance and prompt settlement this month. Edward C. Congdon and Harvey A. Garver."

Trippett and Meadows sent in response to the last quoted message a night-letter, as follows: "We have your Western Union Telegram of nineteenth containing firm offer of five hundred forty three and one-third shares of Texota stock of Polaris Swan Chaffee Elliott and Grinninger at one hundred ninety two dollars per share cash·less any distribution received subject immediate acceptance and settlement this month Stop We hereby accept your offer and instruct you to send all of said stock to Peoples National Bank Tyler Texas properly endorsed and attached to draft on us for said purchase price to be held by bank until Wilsons eighteen shares which we are likewise handling by wire is also received by bank it being understood however per your telegram that settlement in any event is to be made this month Stop Please instruct Bank regarding remittance of proceeds of draft or if you prefer send stock to said bank with letter of specific instructions instead of draft. R. G. Trippett and A. H. Meadows."

This message was evidently filed on the evening of the 19th, as indicated and reached Duluth, Minnesota at 5:06 A. M., December 20th, the day on which Trippett and Meadows went to Tyler, Texas, and closed the deal with the Rancho Oil Company and the money was finally paid for the stock on December 31, 1934. The number of shares transferred under this arrangement was 168⅓ Class B and 375 shares of Class A stock. The price of $165,000 received by Trippett and Meadows was the equivalent of $220 for each of the 750 shares of stock. There was sufficient cash in the Treasury of the corporation to pay $20 additional on each share. I conclude Trippett and Meadows knew what they would receive for the property before they closed the purchase of the stock from the other stockholders. None of the Minnesota group knew anything about the negotiations by Trippett and Meadows for the sale of the property of the Texota Oil Corporation to the Rancho Oil Company prior to January 15, 1935, after they had delivered their stock and received the price.

Back in September, 1934, efforts had been made to compose the differences between the groups, growing out of the attempted amendment of the charter, and the litigation in the State courts. Trippett and Meadows had made an offer to purchase the stock interests of the Minnesota group on terms of credit which would have netted, including funds in the Treasury, $192 per share. A counter-proposition was made by the Minnesota group, which required the payment of money within a shorter period of time. This last offer was never accepted and nothing further came of it.

The price finally paid for the stock in controversy here was $192 per share, including the cash in the Treasury, and which was the same figure which the Minnesota group had offered to take for it back in September.

The price which Trippett and Meadows received for the property was as above stated, on the basis of $220 per share, and this added to the funds in the Treasury, equivalent to $20, gave them a total of $240 per share. Deducting the price which they paid left a profit of $48 on each share which was purchased from plaintiffs and intervenors, or exactly 25%.

■ From all the circumstances surrounding the matter, I am forced to conclude

that in mentioning their need "for the connections" in their telegram of December 17th, 1934, Trippett and Meadows intended the same as a measure of coercion or "pressure" upon the Minnesota group. There was undisputed testimony that the former had been engaged in running hot oil, and that with them in control of the Texota property there would have been no way for plaintiffs to ascertain whether they were receiving credit for their full share of all oil produced from the property. Having also concluded that they knew at that time they could sell the property for $175,000 with four wells on it; that nothing was shown that they intended to make the connections stated, but were actually engaged in closing a deal with the Rancho Oil Company, the statement that they needed the connections for their own use, was a misrepresentation of a material fact, intended to influence the action of the plaintiffs.

It is contended by defendants that because plaintiff and intervenors had refused to recognize them as the lawful officers and directors of the corporation, plus the controversies which had gone on since the purchase into the corporation of Trippett and Meadows on April 5, 1934, the latter were under no obligation to disclose what was happening when they purchased the stock. It is also urged that because the plaintiff and intervenors had, under the circumstances stated above, offered to sell their stock at $192 a share prior to the sale of the property to the Rancho Oil Company, they were not injured and should not, therefore, complain. It is also pointed out that there is evidence to the effect that a fair average price for similar property was $40,000 per well, and with the fourth well to be drilled at an expense of $10,000, this would have left the tract a value of $150,000, net.

However, I have carefully considered all of these matters and am impelled to the view that the defendants, who held only a fraction of a share in excess of half of the controlling class of stock, which enabled them to maintain exclusive possession and control of the company and its affairs, were not absolved from the duty of dealing fairly with their associates. They could not take advantage of the information which they alone possessed, in view of their position. My conclusion is that their conduct cannot be viewed in any other light than as a fraud against the plaintiff and intervenors. For this reason I think the latter are entitled to an accounting for the difference between what they received for their stock and what would have been distributed to them out of the proceeds of the property and the funds on hand had defendants treated them fairly. See Westwood v. Continental Can Company, 5 Cir., 80 F.2d 494.

Proper decree should be presented.